IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 1:09CR12 |
|         Plaintiff, | ) | MAY 5, 2009 |
| | ) | |
|    vs | ) | |
| | ) | |
| MICHAEL BRUCE DARCY, | ) | |
| | ) | |
|        Defendant. | ) | |
| _____/ | | |

TRANSCRIPT OF ELECTRONICALLY-RECORDED
SUPPRESSION HEARING

BEFORE THE HONORABLE DENNIS HOWELL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE UNITED STATES     DAVID A. THORNELOE, ESQ.
                                    U. S. Attorney's Office
                                    100 Otis Street
                                    Asheville, NC 28801

FOR THE DEFENDANT        FREDILYN SISON, ESQ.
                                      Federal Defenders of WNC
                                    1 Page Avenue
                                    Asheville, NC 28801

Proceedings digitally recorded and transcript prepared by:

JOY KELLY, RPR, CRR
U. S. Official Court Reporter
Charlotte, North Carolina
704-350-7495

**I N D E X**

**WITNESS**                                                          **PAGE**


JAMES A. NEWTON

  Direct Examination By Mr. Thorneloe ................5
  Cross Examination By Ms. Sison ...................15
  Redirect Examination By Mr. Thorneloe ............28
  Recross Examination By Ms. Sison .................30


ANDREW F. ROMAGNUOLO

  Direct Examination By Mr. Thorneloe ..............41
  Cross Examination By Ms. Sison ...................50


MICHAEL BRUCE DARCY

  Direct Examination By Ms. Sison ..................61
  Cross Examination By Mr. Thorneloe ...............73


JAMES A. NEWTON (Rebuttal)

  Direct Examination By Mr. Thorneloe .............101
  Voir Dire Examination By Ms. Sison .............102

**GOVERNMENT'S EXHIBITS**

**NUMBER**                                                      **ADMITTED**

1        ..........................................11

2        .........................................103

P R O C E E D I N G S

(Hearing commenced at 10:07:06 a.m.)

THE COURT: Ms. Sisson, do you need some time to talk to Mr. Darcy?

MS. SISON: No, Your Honor. I had that opportunity downstairs. Thank you.

THE COURT: Mr. Thorneloe, are you ready?

MR. THORNELOE: Yes, Your Honor.

THE COURT: Are you ready, Mr. Thorneloe?

MR. THORNELOE: Yes, Your Honor.

THE COURT: I'm going to call the case of United States of America v. Michael Bruce Darcy, which is file 1:09CR12, which is here pursuant to a motion to suppress and request for evidentiary hearing that was filed by Ms. Sison on behalf of Mr. Darcy on April 23rd, 2009.

The matter has now been referred to me to have a hearing and to do a Memorandum and Recommendation to Judge Thornburg.

The motion appears to be a motion to suppress an oral statement made by the defendant. I think the burden is on the government to prove that the statement was knowing and voluntarily. Evidently there's been an admission that it was a custodial statement, that being one of the two issues. Is that correct?

MR. THORNELOE: That's correct, Your Honor.

1          THE COURT:  Let's hear what evidence that the

2     government has in regard to the statement being knowing and

3     voluntary.

4          MS. SISON:  Your Honor, I understand that the

5     government will be calling both agents.  If we can have them

6     sequestered, I'd appreciate it.

7          THE COURT:  Do you want to be heard about that

8     motion?

9          MR. THORNELOE:  No objection to that, Your Honor.

10          THE COURT:  All right.  How many witnesses are you

11     going to have, Mr. Thorneloe?

12          MR. THORNELOE:  Your Honor, I only intend to

13     initially call Special Agent Newton.  However, I will

14     reserve Special Agent Romagnuolo for rebuttal, therefore,

15     I'd like to keep Agent Newton in the courtroom for now.

16          THE COURT:  All right.  Agent Romagnuolo, if you

17     could, you could go into my office if you want to.

18          THE SPEAKER:  I'll wait in the hallway, Your

19     Honor.

20          THE COURT:  It really uncomfortable.  Just hit the

21     buzzer and sit on the couch and have a nice conversation

22     with my secretary.

23          THE SPEAKER:  Thank you, Your Honor.

24          THE COURT:  All right.

25          MR. THORNELOE:  Your Honor, the government calls

1   Jamie Newton.

2           THE COURT:  Agent Newton, come around, please,

3   sir.  I need you to put your left hand on the Bible, raise

4   your right, take the oath to tell the truth from the clerk.

5                       **JAMES A. NEWTON**

6   being duly sworn, was examined and testified as follows:

7                     **DIRECT EXAMINATION**

8   **BY MR. THORNELOE**

9   Q    Special Agent Newton, would you please state your full

10  name for the record.

11  A    James A. Newton.

12  Q    And who do you work for?

13  A    I'm a special agent with the Federal Bureau of

14  Investigation.

15  Q    And where are you based out of?

16  A    The Hickory Office of the FBI.

17  Q    And how long have you worked for the FBI?

18  A    Just over three years.

19  Q    And did there come an occasion when you came into

20  contact with the defendant, Mr. Darcy?

21  A    There was.

22  Q    And what were the general circumstances under which you

23  made this contact with him?

24  A    We had spent that morning trying to locate him in

25  Boone, North Carolina, where he was -- had been living

1    previously.

2        Through the course of the investigation we determined

3    that he was actually living in Andrews, at his brother's

4    house.

5    Q    So Special Agent Newton you were an agent assigned to a

6    case involving Mr. Darcy.  Is that right?

7    A    That's correct.  We had an arrest form for him and we

8    were trying to locate him to arrest him that morning.

9    Q    Okay.  Which morning was that?

10   A    That would be the morning of the 24th of February of

11   2009.

12   Q    Okay.  And you said you had an arrest warrant for him.

13   Is that right?

14   A    We did.

15   Q    And what did you do to try to locate Mr. Darcy?

16   A    First we -- basically through -- we contacted his wife.

17   His wife explained where he was.  His wife's -- his brother

18   was friendly with the sheriff of Cherokee County, I believe.

19   I'm not really familiar so -- and Special Agent Romagnuolo

20   was friendly with that sheriff.  He contacted that sheriff

21   and asked him since we were over in Boone at the time, to

22   contact -- to drive by that house, see if Mr. Darcy was at

23   the house, at his brother's house.

24       After that he wasn't -- the sheriff called us back and

25   asked if we wanted -- if he wanted to contact -- he had his

1    cell -- like I said he was -- like I said he was friendly

2    with Mr. Darcy's brother.  We said contact him on the cell

3    phone.

4        He called him, and then shortly after that Mr. Darcy

5    called Special Agent Romagnuolo on the telephone.  I was

6    sitting across from him.  We were at lunch.  I heard that --

7    I heard Special Agent Romagnuolo say, "We have an arrest

8    warrant for you and we'd like for you turn yourself in.

9    When can you be in Asheville?"  He was in the Winston-Salem

10   or Greensboro area at a doctor's appointment and would be

11   driving back through Asheville 6:00, 6:30-ish, and said he

12   would turn himself in.

13       And pretty much on time we met him at the FBI office,

14   the federal building, and that's when -- when I first

15   encountered him.

16   Q    And at that point did you handcuff him or arrest him or

17   anything like that?

18   A    We informed him he was under arrest.  He was on

19   crutches, so -- and it appeared that he would not be able to

20   stand without his crutches, so we decided not to handcuff

21   him.

22       We searched him and ran him through the metal detector

23   that's at the front of the federal building, and informed

24   him and his brother that he was under arrest and we would be

25   bringing him that night -- that we wanted to talk to him.

1  After that we would bring him to the Buncombe County

2  Sheriff's Office, and then -- and then have an initial

3  appearance the next morning.

4  Q    Okay.  And where did his brother go from there?

5  A    His brother left and went back to Andrews as far as I'm

6  seeing --

7  Q    Okay.

8  A    -- as far as I know.

9  Q    All right.  Who was there with you at the FBI office?

10 A    It was myself, Special Agent Romagnuolo and Mr. Darcy.

11 Q    And did you proceed to do an interview with Mr. Darcy?

12 A    We did.  We brought him into the conference room

13 because it's a little more comfortable seating.  We were a

14 little concerned about his -- you know, being comfortable,

15 because he was -- well, got him -- we allowed him to go to

16 the bathroom, got him a Coke, and then proceeded to talk to

17 him.

18 Q    Okay.  Is that a room you normally use for

19 interrogations exclusively?

20 A    I'm not in this office so I can't say that I've

21 normally done anything.  But I know they have a separate

22 interrogation room that's a little more stark, a little more

23 Spartan.

24 Q    It's just a regular conference room?

25 A    Yeah.  Very -- you know, nice long table, swivel

1    chairs.

2    Q    All right.  And before you began questioning Mr. Darcy,

3    what did you do to advise him of his rights?

4    A    First we -- we talked a little bit about his medical

5    condition; more just kind of small talk.  We -- he had

6    mentioned something about some medications he was on and --

7    and needing them.  He talked mostly about them for his

8    palsy.  And then we proceeded to read him, or presented him

9    with a FD -- FD-395 I believe, but it's the Advice of Rights

10   form for the FBI.

11   Q    Okay.  I have in my hand here a document.  I previously

12   showed it to the defendant.  I marked it as Government's

13   Exhibit 1 for identification.

14            MR. THORNELOE:  Your Honor, may I approach the

15   witness with this document?

16            THE COURT:  Have you seen this, Ms. Sison?

17            MS. SISON:  Yes, I have, Your Honor.

18            THE COURT:  Go right ahead.  Any objection,

19   Ms. Sison?

20            MS. SISON:  No, Your Honor.

21   **BY MR. THORNELOE**

22   Q    Special agent, do you recognize this document?

23   A    I do.

24   Q    And what is it?

25   A    It is the FD-395, Advice of Rights form, that we

1   presented to Mr. Darcy that evening.

2   Q    And could you explain to the Court how it is that you

3   present that document to a suspect?

4   A    We talk to them.  We presented the form to him.  Said,

5   "This is your Miranda waiver form, Advice of Rights.  Before

6   we can talk to you, we need to -- we need you to sign it."

7        He then said -- I mean he stared at it for a few

8   seconds, said -- something to the order of, "I want to talk

9   to you but I'm not sure if I want to sign this right now."

10       I then very specifically remember saying to him, "Well,

11  you're a former police officer and you know what this is and

12  what it means, and you know that we can't talk to you if you

13  don't sign it. "

14       Then we asked him -- so we asked him to read aloud each

15  line and initial next to each line, which he did.  And then

16  at the end of it he signed it and I signed it and

17  Special Agent Romagnuolo signed it and we put a time on it.

18  Q    Okay.  So each and every line, you said he read that

19  aloud?

20  A    Aloud.

21  Q    Did he have any trouble reading those lines?

22  A    None at all.

23  Q    Okay.  Did he have any -- did he -- did you say he

24  thought about it a little bit whether he wanted to sign that

25  at first?

1   A     Prior to he did.  He definitely contemplated for a

2   couple seconds.

3   Q    Did he seem to be confused about what the form meant?

4   A    No.  No, he did not.

5   Q    Did he have any trouble making initials or signing his

6   name to it?

7   A    He -- he -- only that he had a cast on that wrist so

8   holding a pencil was a -- or holding a pen wasn't the

9   easiest thing for him, but no.

10  Q    Okay.  So he didn't seem confused about the

11  circumstances of the waiver?

12  A    No.

13  Q    Did he mention any pain medication that he was taking

14  to you?

15  A    He did not.

16  Q    Did he say that he was in pain at the time?

17  A    No.

18  Q    All right.

19         MR. THORNELOE:  Your Honor, I'd ask now that the

20  Court receive Government's Exhibit 1 into evidence.

21         THE COURT:  Any objection?

22         MS. SISON:  No, sir.

23         THE COURT:  Let it be admitted.

24         (Government's Exhibit No. 1 received.)

25  **BY MR. THORNLOE**

1  Q    Special Agent Newton, I'd just like to discuss a little

2  further about what he said to you regarding his medical

3  condition and any medications he was on.

4       Could you tell me a little bit about what he may have

5  said with regards to medication for a palsy condition?

6  A    I believe -- I believe it was palsy.  He went into --

7  he went into pretty good depth about being worried about

8  having that medication over the next couple of days.  I

9  remember he asked about it then, and then in the subsequent

10 initial appearance he -- he said -- he talked about how he

11 had surgery on his leg, and following that surgery I think

12 he had to have it a second time because the -- his palsy

13 caused a little bit of muscle contractions, and the muscle

14 contractions tore out some stitches which made the surgery

15 worse.

16      We talked about his wrist a good bit.  His leg.  He

17 talked a little bit about the accident that he -- that he

18 got into.  Yeah.

19 Q    Okay.  Did he say that his palsy medications had a

20 affect on his mental abilities?

21 A    No.  He never made that statement.  In fact -- in fact,

22 we talked about how he had the palsy before he -- when --

23 you know, he's had it all his life.  And he had had to get

24 some waivers and -- to be a police officer, and how it was a

25 bit of a stumbling block but, you know, obviously it didn't

1  affect his ability.  And he felt confident he could be a

2  police officer with the palsy.

3  Q    Okay.  Now, after he gave the Miranda waiver, did he

4  proceed to make any statements about what -- about the case

5  you were investigating?

6  A    He did.

7  Q    Were they detailed statements?

8  A    Yes.

9  Q    Did they involve timelines and placing things in the

10  proper sequence in history?

11  A    Yes.

12  Q    Did he have any trouble doing that?

13  A    No.

14  Q    Just generally speaking, how did he seem to feel when

15  he gave this -- made these statements to you?  Did he have

16  any sense of -- did you detect any sense of relief?

17  A    I would say at one point there was a -- there was a

18  definite relief point.  He made a statement that this is the

19  first time he told anyone about this.  And it seemed like

20  that was -- I mean in my opinion that was a relief-type

21  statement when he said that.

22  Q    Approximately how long did this interview go on?

23  A    I want to say it was two hours, to the best of my

24  recollection.

25  Q    And did there come a time when the interview changed

1    from questions you had for him and maybe some questions that

2    he had for you?

3    A    Right.  Towards the end it definitely shifted to -- I

4    would say the last, possibly even quarter of it, we talked a

5    little more.  We kind of stopped asking.  We felt we had

6    gotten the information we wanted.  And he asked many

7    questions about a detention hearing; about whether he would

8    be released, about the arraignment the next day.  You know,

9    just what the next few days would be like.  What we thought

10   his chances -- he had several questions about what we

11   thought his chances were with being detained versus

12   released.  I gave him the best answer I could at the time.

13   Q    Okay.  Did he ever fall asleep during the interview?

14   A    No.

15   Q    Did he ever go into a stupor or act confused?

16   A    No.

17   Q    Did he have any trouble speaking or did he slur his

18   words?

19   A    No.

20   Q    At any time during the interview did you become

21   concerned that he didn't understand what was going on any

22   further?

23   A    No.

24   Q    Did he ever change his mind about the waiver?

25   A    No.

1    Q    Do you recall what, if anything, he said to you guys

2    when you finally parted ways?

3    A    He actually thanked us for being nice and professional

4    to him.

5              MR. THORNELOE:  Thank you, Agent Newton.  That's

6    all questions I have for you.

7              MS. SISON:  Thank you, Your Honor.

8                          **CROSS EXAMINATION**

9    **BY MS. SISON**

10   Q    Agent Newton, I take it when you were looking for him

11   you meant to arrest him.  That wasn't a ploy or anything?

12   A    No, no.  We fully intended to arrest him, yeah.

13   Q    Okay.  And you were in his neck of the woods where you

14   believed he had been living at that time.  Correct?

15   A    Yes.

16   Q    And so my understanding is you intended to take him

17   into custody and bring him to the Buncombe County Jail so he

18   could make an initial appearance in court the very next day?

19   A    At what point in time are you talking about?

20   Q    I'm talking about when you were trying to locate him

21   and you had called the sheriff.

22   A    Had we been in Boone, and when we -- had we been in

23   Boone when we arrested him, depending on the time of day, we

24   would have taken him -- you know, we would have taken him to

25   whatever jail was convenient for bringing him for initial

1    appearance the next day, I guess.  So it wouldn't

2    necessarily have been the Buncombe County Jail, that we

3    wouldn't have taken him -- had we located him earlier that

4    day.

5    Q    So -- just so I get this straight, if you had done

6    that, if you had located him, you would have just taken him

7    to one of the local jails?

8    A    Had we located him earlier, we still would have tried

9    to speak with him, and then we would have taken him to jail,

10   yes.

11   Q    Okay.  And so it was your every intention at that point

12   to speak to him before he made any kind of initial

13   appearance?

14   A    Yes.

15   Q    And so when you couldn't locate him in Boone, that's

16   when you contacted the sheriff who was familiar with him?

17   A    Familiar with his brother; knew his brother, yes.

18   Q    Okay.  And so when that occurred, and you were able

19   to -- or actually your -- the other agent was able to speak

20   to him then you went back to Asheville I take it?

21   A    I was in Boone.  That was probably -- we spoke with him

22   around -- I would to say about 1:00 is when we spoke,

23   because we were eating lunch at the time.  I think I went

24   home, had some dinner, and then made sure to be -- made sure

25   to be in Asheville -- I live in Hickory.  So I went home.  I

1  think I walked my dog, and then I met -- was in Asheville

2  prior to when he said he would arrive.

3  Q    Okay.  And you made it clear to him not to meet you at

4  the Buncombe County Jail but instead to meet you at the FBI

5  office in the federal building next to this building.

6  Correct?

7  A    Yes.

8  Q    And so you had every intention to speak to him?

9  A    Yes.

10 Q    And you were going to speak to him with -- and I'm

11 sorry, it's Agent Romagnuolo?

12 A    Romagnuolo.

13 Q    Roma --

14 A    Romagnuolo.  Please, Your Honor, don't ask me to spell

15 it.

16 Q    -- nolo.  I just want to make sure I'm pronouncing it

17 correctly.

18     And so when -- when Agent Romagnuolo spoke to him on

19 the phone, his brother was present.  Correct?

20 A    Yes.

21 Q    And both you and the other agent knew that he was on

22 his way, or was in Winston-Salem to talk to a doctor?

23 A    Yes.

24 Q    And that he would see you after he had the doctor's

25 appointment?

1    A    Yes.

2    Q    Did you know what the doctor's appointment was for?

3    A    No.  I assumed it was for his leg.

4    Q    Did you know if he was going to take any medication

5    prior to seeing you?

6    A    No.

7    Q    So you had no information until he actually showed up

8    at your office?

9    A    Yes.

10    Q    And so when he showed up at your office, it looks like

11    he showed up with his brother and his sister-in-law?

12    A    Yes.

13    Q    And you told him to leave after you arrested him.

14    Correct?

15    A    Yes.  We spoke -- we spoke with him for a good ten, 15

16    minutes, because they were curious about what his

17    situation -- if they would have to stick around to pick him

18    up; if they would pick him up the next day, where he would

19    be.  So we gave them pretty good information about where he

20    would be and such.

21    Q    Would they have been allowed to go upstairs with him?

22    A    Well, it's on the same floor.  But if they had asked,

23    sure.

24    Q    Okay.  So what I'm hearing from you is that you

25    asked -- they just left on their own accord.  You didn't ask

1    them to leave?

2    A    I don't know how to answer that question.  I don't

3    really -- when Mr. Darcy arrived with his -- I was --

4    there's a -- when you walk in the door there's a metal

5    detector and a security guard.  Myself and the security

6    guard were searching Mr. Darcy; talking to him, explaining

7    what's going on.  Searching him.  Running him through the

8    metal detector, going through his pockets and such.  And

9    Special Agent Romagnuolo was speaking more with the brother.

10   I heard part of that conversation, but I can't say that we

11   told him one way or the other to leave or not, or not to

12   come in.  I'm sure we said we are going to speak to

13   Mr. Darcy.

14   Q    Okay.  So you don't know what the conversation was

15   between Brian Darcy and Agent Romagnuolo?

16   A    I don't know all of it, no.

17   Q    So it's possible that he might have told him he had to

18   leave?

19   A    It's possible.

20   Q    Okay.  When you brought him to the conference room and

21   you said it was on the first floor, and you -- you had --

22   you testified that you had -- you made small talk about his

23   medication.

24   A    Medical condition.

25   Q    Oh, medical condition.  I'm sorry.

1     When you say "small talk," can you just be more

2  precise?  How long did the conversation take place about his

3  medical condition?

4  A    I can't -- minutes.  Five to ten minutes.  Basically we

5  moved him in there and then we let him go to the bathroom.

6  He was moving.  He walked -- or he did walk fairly slowly

7  with the crutches, so, you know, you're talking about if

8  he's okay, if he -- you know, that kind of thing.  I know at

9  one point where he said he couldn't stand on one -- you

10  know, that's kind of why we had to use a wand.  We couldn't

11  walk him through the metal detector.

12     I know at one point we asked him, you know, prior to,

13  right when we sat down we kind of explained where he was and

14  what he was doing, you know, like, "You're under arrest.

15  We'd like to talk to you about this."  We asked him if he

16  was okay to speak with us.  He said "yes."

17  Q    But you were fully aware that there was something wrong

18  with him physically?

19  A    Yes.

20  Q    And that's just from looking at him?

21  A    Yes.

22  Q    And you did take time to talk to him about his medical

23  condition?

24  A    Yes.

25  Q    When you talked to him about his medical condition, did

1  you ask him specifically what kind of medication he is on?

2  A    I did not.

3  Q    Did the other agent?

4  A    No.

5  Q    So I take it you had no information as to what affects

6  these medication would have had on him?

7  A    No.

8  Q    Or his mind?

9  A    No.

10  Q    And so I take it you based your -- your understanding

11  of what his medical condition was just from looking at him

12  physically?

13  A    And speaking to him.

14  Q    And from speaking to him you made up your mind that he

15  was all right to -- to do the waiver and also answer your

16  questions?

17  A    And ask him if he was all right to do the waiver.  I

18  mean, we asked him if he was okay to go on, to speak to us.

19  Q    Did you specifically ask whether or not the medications

20  he may have been on would affect his understanding of what

21  was happening at that point?

22  A    I did not specifically ask that, no.

23  Q    Did the other agent?

24  A    Not to my knowledge.

25  Q    Now, I take it you were in the same room with the agent

1　during the entire time you questioned him after you got into

2　the conference room?

3　A　　I believe Special Agent Romagnuolo left to get us some

4　beverages at one point.

5　Q　　And so who did most of the talking during this

6　interview, you or he?

7　A　　I would say I did more, but he did speak during --

8　Special Agent Romagnuolo did ask questions.

9　Q　　Okay.  So he just wasn't are silent partner taking

10　notes?

11　A　　No.

12　Q　　Were you both taking notes at the same time?

13　A　　No.  I was taking notes.

14　Q　　The other agent wasn't?

15　A　　Not to my knowledge.

16　Q　　Okay.  And when you spoke to Mr. Darcy, what kind of

17　tone did you use?

18　A　　A normal tone, I guess.

19　Q　　Like right now?

20　A　　Yes.

21　Q　　Okay.  And you didn't raise your voice?

22　A　　No.

23　Q　　And from the time that he came into contact with you at

24　the FBI building until the time you gave him his rights, how

25　much time would you say had elapsed?

1  A    From the time he arrived until the time that we issued

2  him his rights?  More than 15 minutes, less than 45 minutes.

3  Q    Okay.

4  A    That's the best I can ...

5  Q    And I do note that it says on the form, it says 1829.

6  So did you meet him exactly at 6:00 as he had promised to

7  come?

8  A    I don't -- I don't -- I don't recall.  That's an

9  estimate.

10 Q    Okay.  So between 15 and 45 minutes --

11 A    Yes.

12 Q    -- is the time that you would have given him his

13 rights?

14 A    Yes.  After he arrived, yeah.  Because we searched him.

15 We brought him in, let him go to the bathroom.  Got him a

16 drink.  Kind of -- you know, make sure he was comfortable

17 and then went forward.

18 Q    So there was some conversation going on at that time

19 before the rights were given to him?

20 A    Yes.  But more of a -- of a, "Are you okay?  Do you

21 need anything, a drink," that kind of nature.

22 Q    Okay.  Now, when you gave him this Advice of Rights,

23 who specifically gave him the piece of paper and spoke to

24 him?  Which agent?

25 A    I did probably most of it but I know

1  Special Agent Romagnuolo spoke to him during the thing,

2  during the -- I mean five minutes or so when this was

3  happening.

4  Q    How long did it take -- from the time you showed him

5  this piece of paper until the time he signed it did it take?

6  A    Five to ten minutes.

7  Q    Five to ten minutes.  And how close were you sitting to

8  him when you were reading him or he was reading this piece

9  of paper?

10  A    Across -- he was at the head of the table and we were

11  at basically the first seat on either side of that table.

12  Q    So face to face, maybe two to three feet at most?

13  A    Yeah.  Yeah, five feet probably, yeah.

14  Q    And there was a barrier between you, the desk or the

15  table?

16  A    Yeah.  But we were -- we were on the corners, on the

17  sides, yeah.

18  Q    Oh, got you.  So it would have been a 90-degree angle?

19  A    Yes.

20  Q    Where was Agent Romagnuolo?

21  A    Opposite of me.  So like I said, he was on the end of

22  the table and then we were on the first seat basically on

23  either side of the table.

24  Q    And I take it the interview was neither videotaped nor

25  tape-recorded?

1  A    It was not.

2  Q    Okay.  At any to point did both of you start talking to

3  him at the same time?

4  A    No.  I don't think so.

5  Q    And what was his demeanor throughout the interview?

6  A    Mr. Darcy's?

7  Q    Yes.

8  A    Conversational.  It changed slightly, depending on what

9  we were talking about I guess.

10  Q    Can you be more specific when you say "change."  I know

11  that you had said that he didn't act confused and he didn't

12  look like he was in a stupor.  Can you be more exact as to

13  how it changed, from what demeanor to -- the change?

14  A    I think at one point, earlier on he was friendlier.

15  Later on when he was -- when we were getting into details of

16  what we were asking about, he might have -- his shoulders

17  slumped I guess a little bit, I would say, more from the

18  kind of thing when a person -- I don't want to say shameful,

19  but in an admitting way sometimes people's demeanor change.

20  It was minor, you know.

21  Q    And both you and the other agent are trained agents.

22  You have been at this for a while.

23  A    Yes.  Myself three years, and Special Agent Romagnuolo,

24  I believe, over ten.

25  Q    And I take it that when you were at the academy or

1    maybe follow-up classes, you learned to interview suspects?

2    A    Yes.

3    Q    And in this case did you have any additional concern

4    with interviewing a police officer?  A former police

5    officer?

6    A    I don't think I handled it any differently than I would

7    have, no.  I mean, we were -- no, during the interview

8    phase, I don't think so, no.

9    Q    And before you talked to him, did you and

10   Agent Romagnuolo have some sort of discussion as to how you

11   were going to ask these questions?

12   A    No.  I don't think there was a large -- a large game

13   plan or anything that was put in.

14        Special Agent Romagnuolo was not terribly familiar with

15   the case.  It was my case.  And like I said, I'm out of the

16   Hickory office.  So up until that day, he probably never

17   heard of Mr. Darcy.  He had a very, you know -- just what

18   from the briefings earlier that day, arrest briefings

19   earlier that day was all he knew about the crime or anything

20   like that, so he wasn't as familiar.

21   Q    So if he wasn't --

22   A    That's why he didn't ask as many questions.

23   Q    So if he wasn't familiar with the case, why did it take

24   two FBI agents to interview Mr. Darcy?

25   A    That's standard procedure for -- I mean you'd never be

1    alone with a suspect for an interview.

2    Q    And why is that?

3    A    Why?

4    Q    Yes, sir.

5    A    Safety precautions.

6    Q    Just in case he may do something --

7    A    That's right.

8    Q    -- the suspect.

9         When you and the other agent found out that he was

10   coming in from the doctor's, did either one of you have any

11   concerns as to what condition he might be in?

12   A    I'm sure we did, but you take it as it comes I guess.

13   You know, you deal with the situation at hand, and the

14   situation at hand was when he arrived he appeared completely

15   willing an able to speak with us.

16   Q    But you didn't ask him if he was taking any medication

17   at that point?

18   A    We actually -- I believe Special Agent Romagnuolo spoke

19   about medication early on and he said -- in a more -- in a

20   general way about his -- if he was able to talk to us.

21   Q    Specifically did he say, "Are your medications going to

22   affect what's happening with you as we ask you these

23   questions," or something like that?

24   A    Specifically he did not say that but the question

25   implied -- inferred that.

1    Q    Okay.  But it wasn't directed?

2    A    It wasn't as explicit as the way you stated it, no.

3    Q    Okay.  Thank you, sir.

4         MS. SISON:  I have no more questions, Your Honor.

5         MR. THORNELOE:  Just a couple questions, Your

6    Honor.

7                    **REDIRECT EXAMINATION**

8    **BY MR. THORNELOE**

9    Q    Special Agent Newton, was there anything unusual about

10   speaking to a defendant before an initial appearance?

11   A    No, not at all.

12   Q    Did the family specifically ask you if they can stay

13   for the interview?

14   A    No, they did not.

15   Q    Did they ask you if they could go get a lawyer and then

16   come back, start --

17   A    No.  No.

18   Q    Did they tell you that he was in no condition for an

19   interview at the time?

20   A    No.

21   Q    All right.  Was any part of the statement you received

22   or any admissions that Mr. Darcy made to you pertaining to

23   the case received prior to the Miranda warning?

24   A    No.

25   Q    And you said he had talked generally about his medical

1  condition and medications.  Right?

2  A    Right.

3  Q    Would that have been an opportunity to bring up

4  whatever was pertinent at the time?

5  A    I guess it would have -- from an case stand point?

6  Q    Right.

7  A    Oh, I guess it would have been.  There were openings,

8  sure.

9  Q    Would it have been a natural thing if it had been

10  important for him to mention it to you at that point?

11  A    I believe so.  Like I said, he spoke a lot about his

12  recent medical history resulting from the accident, and he

13  never mentioned pain medications or being in pain.  He

14  talked a lot about the surgeries and how -- they had not

15  worked well and he may need more.  And how -- his wrist and

16  such.

17  Q    Just a little more detail.  You mentioned a palsy

18  condition.

19  A    I believe that's what --

20  Q    Other than the palsy, what did you know was the cause

21  of any of his medical conditions?

22  A    He had been in a car accident following -- on

23  September 16th -- 15th I believe of 2007.

24  Q    2000 when?

25  A    2008.  I'm sorry.  September 15th of 2008, on or about.

1  Q    All right.  And did he go into with you what was wrong

2  with his legs?

3  A    His leg had been -- he had gotten into an -- I guess a

4  head-on collision, it was the best of my understanding, with

5  a vehicle and that that had injured his leg and he had had

6  surgeries following that.

7  Q    But he didn't say anything about needing constant

8  medication regarding those -- that accident?

9  A    No.  His biggest thing when he talked about it, it was

10 the -- the -- the prior condition kind of affecting that

11 with the muscle contractions was the thing that he spoke --

12 and I kind of remember him speaking pretty in-depth about

13 that medication being necessary for to keep the stitches

14 from -- that had previously ripped out stitches.

15 Q    Okay.

16         MR. THORNELOE:  Nothing further, Your Honor.

17         THE COURT:  Any further questions?

18         MS. SISON:  Yes.

19                    **RECROSS EXAMINATION**

20 **BY MS. SISON**

21 Q    Did you tell the family that you were going to

22 interview him and not just take him to the jail prior to

23 their leaving?

24 A    I don't recall.  Like I said I believe

25 Special Agent Romagnuolo did more talking to the family, to

1    the brother and sister-in-law, than I did.

2    Q    So you don't know what he told them?

3    A    I don't know everything he told them, no.

4    Q    And then when you had the conversation with Mr. Darcy

5    around lunchtime, you told him that you were interested in

6    arresting him and taking him into custody.  Correct?

7    A    We told him we were going to arrest him, right.

8    Q    And you never said, "We're going to interview you prior

9    to that"?

10   A    We may have said, "We need to talk to you."

11   Q    You may have said that but you're not sure?

12   A    Right, I'm not.

13   Q    And so did either one of you ask the brother or

14   sister-in-law if they had any concern about his medications

15   or if he was under any pain before they left?

16   A    I don't -- I don't recall.

17   Q    Okay.  And it sounds like you did talk a lot about his

18   medical conditions but -- and correct me if I'm wrong, it

19   seems to me you never asked him what effects the medication

20   had on him.  Would that be fair to say?

21   A    I did not go into depth into the facts of the

22   medication, no.

23            THE COURT:  What medication are you talking about?

24            THE WITNESS:  Any -- I assume any of them that he

25   was on.

 1          THE COURT:  Are we talking about the palsy

 2    medicine?  Are you talking about some other medicine?

 3          MS. SISON:  Any medication.

 4          THE WITNESS:  I did not speak about the effects,

 5    direct effects of any of the medications that he was on, on

 6    his ability to answer questions right then.

 7          MS. SISON:  Okay.  Thank you, sir.

 8          THE COURT:  Mr. Thorneloe?

 9          MR. THORNELOE:  Nothing further, Your Honor.

10          THE COURT:  Had there been any prior state action

11    in regard to the charges against this defendant arising out

12    of the same factual situation?

13          THE WITNESS:  There have not been -- prior to that

14    there were not.  Subsequently, there are -- there have been

15    state charges.

16          THE COURT:  So there's federal charges and then

17    state charges have been brought later.  Is that correct?

18          THE WITNESS:  They were brought afterwards, yes.

19          THE COURT:  What was this statement recorded?

20          THE WITNESS:  No.

21          THE COURT:  In regard to the -- his talking to you

22    about having palsy, can you describe -- is this epilepsy or

23    what did he mean?  What did he tell you about his palsy

24    condition?

25          THE WITNESS:  I can give you -- well, from prior

1    conversations I know that he had a slight limp, prior to

2    this, and that's what I understood to be the main effect of

3    the prior condition.  I think it affected --

4              THE COURT:  Prior conversation with who?

5              THE WITNESS:  Other people.  Other -- like his

6    prior employer.

7              THE COURT:  Had you ever met Mr. Darcy before?

8              THE WITNESS:  No.

9              THE COURT:  At any time did you make any statement

10   to him indicating that he needed to talk to you --

11             THE WITNESS:  Needed to?

12             THE COURT:  -- and Agent Romagnuolo, that he

13   needed to -- that it was in his best interest to talk to you

14   and Agent Romagnuolo and give you, both of you a statement?

15             THE WITNESS:  Best interest.  It's possible.  I

16   mean, when in general when you start talking to a suspect I

17   think that -- and I can't recall in this particular

18   indication -- you usually say, "We'd like to talk to you,

19   you know, and we'd like to hear the truth," and that's --

20   that's -- it's possible.  I don't recall in this case what

21   the initial statements were like.

22             THE COURT:  Did you say anything any more forceful

23   than that?  "We'd like to talk to you.  We're going to give

24   you an opportunity to tell the truth about what happened."

25             THE WITNESS:  No, and no promises were made or

1    anything like that about statements that he would make other

2    than we would report them honestly, you know.

3           THE COURT:  Well, what were you previously before

4    you were an FBI agent?

5           THE WITNESS:  I was on a -- I was in the Navy.  I

6    was a submarine officer in the Navy.

7           THE COURT:  Did you ever receive any training, FBI

8    or other law enforcement training concerning how to discern

9    if someone was under the influence of alcohol or some other

10   type of controlled substance?

11          THE WITNESS:  I never received any specific

12   training in that case, no.

13          THE COURT:  Did he appear to be lucid, have his --

14          THE WITNESS:  I would say he appeared to be

15   exceptionally lucid, like he had -- he asked questions of me

16   on many occasions more than just -- it wasn't an one-way

17   street.  He asked questions about the questions I was

18   asking.

19          THE COURT:  Were there any hard words between you

20   and him?

21          THE WITNESS:  No.  At one point he made a

22   statement that I think that was -- and I do not recall the

23   statement or the point, but I can remember at one point he

24   made a statement that was either false, you know, on its

25   face obviously not true, and I might have said, "Come on,

1  this is what we know.  This is what we know," in this voice

2  that I'm using right now.  "Come on, this is -- you know you

3  just said this so obviously, you know, this statement" or

4  "We know this happened," but never at more than this voice.

5          THE COURT:  Did you ever do anything more coercive

6  than that (simultaneous conversation) --

7          THE WITNESS:  I would say that from the coercive

8  standpoint that was about the most coercive I got.

9          THE COURT:  How about Agent Romagnuolo?  Were

10  there ever any harsh words --

11          THE WITNESS:  Oh, no.

12          THE COURT:  -- harsh words between the defendant

13  and Agent Romagnuolo?

14          THE WITNESS:  No.

15          THE COURT:  Anything that he said to the defendant

16  that was coercive, try to make him give a statement?

17          THE WITNESS:  No promises.  I'm sure he said

18  something to the effect that, you know -- to ask him to

19  speak with us or something like that.

20          At the beginning Special Agent Romagnuolo -- he's

21  a little more senior to me -- probably made a statement,

22  like, "Hey, we're here to talk."  Kind of like a blanket

23  statement about why we're here.  "We arrested you.  We're

24  going to talk to you."  It is -- you know -- you know-- but

25  that was -- that was right prior or -- right prior to the

1    actual -- him signing the Miranda statement.

2            THE COURT:  If he told you that he didn't want to

3    talk to you, what would you have done?

4            THE WITNESS:  Well, in the case where -- when I

5    handed him -- what I would have done, I mean if he said, "I

6    do not want to talk to you," in those words, I would have --

7    I would have said, "Okay.  We can't talk to you anymore

8    then."

9            And in the case, where with the Miranda statement,

10   he said, "I'm not sure if I want to sign this right now,"

11   and to which I said, "You understand that if you do not sign

12   this --" and I said, "You're a police officer.  You

13   understand more than most," that the conversation ends right

14   here.

15           THE COURT:  What did he do then?

16           THE WITNESS:  He took the paper -- took the paper,

17   took the pen and read the statement as we asked him to.  And

18   he probably thought about it for another five seconds and

19   then did that.

20           THE COURT:  And I believe you said he read

21   Government's Exhibit 1 out loud?

22           THE WITNESS:  Out loud, each statement.  That's

23   pretty -- I don't say that's standard procedure but that's

24   recommended by a lot of people in --

25           THE COURT:  And you requested that he read it out

loud --

THE WITNESS:  Yes.

THE COURT:  -- to you.

THE WITNESS:  Yes.

THE COURT:  Did he miss any words --

THE WITNESS:  No.

THE COURT:  -- in any the lines?

THE WITNESS:  No.

THE COURT:  He read it correctly.

THE WITNESS:  He read it correctly.

THE COURT:  I notice on Government's Exhibit 1 there are initials beside each question.  Ms. Hightower, can you -- there's initials "MB" -- it looks like a "D" beside each and every one of the various writings.  Did you request -- did the defendant put those markings there?

THE WITNESS:  Yes.  We requested that he read each line.  And right after he read each line, he initialed each line.

THE COURT:  So you told him that he was to read each right out loud and then put his initials.

THE WITNESS:  Yes, sir.  Yes, Your Honor.

THE COURT:  Then he was to read the next one and then put his initials next to that one.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Read the third one, put his initials

1    next to that one.

2              THE WITNESS:  Yes.

3              THE COURT:  David, any questions?  Mr. Thorneloe,

4    any question you might want to ask of Officer Newton as a

5    result of anything I asked him?

6              MR. THORNELOE:  No, sir.

7              THE COURT:  Ms. Sison, anything you might want to

8    ask?

9              MS. SISON:  Yes, Your Honor.

10   **BY MS. SISON**

11   Q    Agent, the Court asked you if there was any prior state

12   action and you said there had not been, and I just want to

13   make sure I understand that.

14   A    He had not been indicted on any state charges prior

15   to -- to the best of my knowledge prior to us arresting him,

16   to the best of my knowledge.

17   Q    Okay.  But had he been interviewed by any local

18   official, and I'm including Beech Mountain Police or the

19   local sheriffs prior to your interviewing him?

20   A    He -- I haven't seen any of those statements, but it's

21   my understanding that Beech -- following his dismissal from

22   Beech Mountain, which was an investigation of an act related

23   to this event but not directly of this event, that he had --

24   it's my understanding he had given statements.  I know there

25   was a big legal or procedural -- because it more about -- it

1  was a firing thing, it wasn't a legal thing.  But they had

2  done an investigation and I believe Beech Mountain actually

3  had a outside organization come in and do an investigation.

4  I've seen some of those statements of -- surrounding him

5  being fired from Beech Mountain.  And that was -- that had

6  something to do with providing alcohol to minors.

7  Q    But I take it that the case came to the FBI's attention

8  as a referral for one of the local jurisdictions?

9  A    That's correct.

10 Q    Okay.  And so you also told the Court that you had not

11 met Mr. Darcy before.

12 A    Prior to him walking into the federal courthouse, or

13 federal building across the street, yes.

14 Q    So you had no information of what his regular demeanor

15 would be like without any kind of medication?

16 A    No.  No, I don't.

17 Q    So is it possible that what your understanding of him,

18 either knowing what he was doing, might have been misplaced

19 because you had no prior experience with him?

20 A    That's possible, but I'd like to say that he -- I

21 wouldn't say that any of his demeanor was out of place or

22 odd from an norm standpoint at all.

23 Q    And when you say normal standpoint, you're just talking

24 about everybody but not him in particular?

25 A    Correct.

Q     Thank you.

MS. SISON:  I have no more questions, Your Honor.

MR. THORNELOE:  Nothing further, Your Honor.

THE COURT:  When I was asking about prior state actions, let me explain.

THE WITNESS:  All right, sir.

THE COURT:  There are small counties, like Avery County.  Their grand jury might meet twice a year, at most three times a year.  And criminal matters are brought by way of a warrant, and then maybe months later will be indicted. Do you know whether or not any warrants relating to these -- to the charges that underlie the federal Bill of Indictment have been taken for him prior to your --

THE WITNESS:  As far as I know prior to -- because I was in communication with some those departments -- prior to there was no arrest warrant issued for him.  Subsequent to that, to related acts, not the act we're in particular charging, there have been I believe.

THE COURT:  Mr. Thorneloe?  Ms. Sison?

MS. SISON:  No, Your Honor.  Thank you.

THE COURT:  Thank you very much, Agent Newton.  Do you wish to call Agent Romagnuolo?

MR. THORNELOE:  Yes, Your Honor.  I'll go ahead and call Agent Romagnuolo.

THE COURT:  All right.

1    Ms. Williams, would you go in my office, or

2 outside and bring in Agent Romagnuolo.

3    We might want to ask Agent Newton now to go

4 outside -- Agent Newton, I'm going to extend to you the same

5 invitation.  Please feel welcome to go into my office where

6 you can be a little more comfortable.

7    Agent Romagnuolo, I need you to come up, put your

8 left hand on the Bible, raise your right and take the oath

9 to tell the truth from the clerk.

10                **ANDREW F. ROMAGNUOLO**

11 being duly sworn, was examined and testified as follows:

12                **DIRECT EXAMINATION**

13 **BY MR. THORNELOE**

14 Q    Agent Romagnuolo, could you please state your full name

15 for the record.

16 A    Andrew F. Romagnuolo.  It's spelled

17 R-O-M-A-G-N-U-O-L-O.

18 Q    And Special Agent Romagnuolo, how are you employed?

19 A    I am a special agent of the Federal Bureau of

20 Investigation.

21 Q    And where are you stationed?

22 A    Asheville, North Carolina.

23 Q    And how long have you been employed by the FBI?

24 A    Approximately eleven and a half years.

25 Q    And prior to your employment with the FBI, where were

1  you employed?

2  A    By the Cortland County Sheriff's Department in Central

3  New York as a corrections officer.

4  Q    Okay.  Agent Romagnuolo, did there come a time when you

5  came into contact with the defendant, Mr. Darcy?

6  A    Yes.

7  Q    And when was that?

8  A    It was February 24th, 2009.

9  Q    All right.  And what were the general circumstances

10 under which you were required to come into contact with him?

11 A    I was assisting Special Agent Newton on one of his

12 cases.  We had an arrest warrant for Mr. Darcy.

13 Q    All right.  And how did you go about serving that

14 arrest warrant?

15 A    We conducted a search warrant at his residence and

16 determined that he was not there.

17      And I contact the Cherokee County Sheriff's Office

18 because of a relationship between the wife and the sheriff

19 there; I have a close working relationship with the sheriff

20 of Cherokee County where the brother lives.

21      He sent officers out to the residence and made contact

22 with the brother, who was provided my information and the

23 brother called me at that point.

24 Q    And what arrangements did you make for the defendant to

25 meet you?

1  A    I talked to Mr. Darcy on the phone and informed him

2  that we had an arrest warrant for him.  And he had a medical

3  appointment in Winston-Salem earlier in the day, so we made

4  arrangements for him to come to the federal building here in

5  Asheville at 6:00 p.m. that evening.

6  Q    And did that occur?

7  A    Yes.

8  Q    And who came to that meeting?

9  A    Mr. Darcy was present for the meeting.  His brother and

10  sister-in-law were present at the point that he turned

11  himself in.

12  Q    All right.  And before you actually sat down to talk to

13  Mr. Darcy, did you have any conversations with the family

14  members?

15  A    I did.  As they entered the federal building, I spoke

16  briefly to the brother, with the sister-in-law present.  And

17  he asked the conditions for the arrest and whether he would

18  be released or detained.

19      He also made mention that Mr. Darcy was on medications

20  at that time and wanted to provide those medications for me

21  to give to Mr. Darcy.

22      At that point I explained to him that the Buncombe

23  County Detention Center policy is that any medications that

24  inmates received are issued through their jail nurse and I

25  couldn't provide any medications to him to take to jail with

1   Mr. Darcy.

2   Q    Okay.  Did the pain -- did the brother or anyone in the

3   family, or Mr. Darcy at that point, tell you about any

4   effects the medications were currently having on him?

5   A    No.

6   Q    Did they ask you if they could be present for any

7   interviews?

8   A    They did, and I told them because he was under arrest

9   that they could not.

10  Q    Okay.  Did they ask you if they could get an attorney

11  to come with him to the interview?

12  A    I don't recall them asking me that.

13  Q    Okay.  And from that point, did the family member say

14  anything else to you that was noteworthy?

15  A    No.

16  Q    And tell me what happened next.

17  A    Well, Special Agent Newton ran Mr. Darcy's property

18  through the metal detector at that point while I was having

19  the conversation with the family members.

20       We escorted Mr. Darcy into our office and went into our

21  conference room, and we began the interview with Mr. Darcy.

22  Q    Would you describe your conference room?

23  A    It's a large room with a conference table, padded

24  chairs, some wall hangings, you know, the Federal Bureau of

25  Investigation letters are labeled on the wall and the Bureau

```
1   seal.
2   Q    Would you describe it generally as comfortable?
3   A    Yes.
4   Q    And do you ordinarily allow suspects to be interviewed
5   in that room?
6   A    We have another interview room.  I prefer to use the
7   conference room for long interviews because it is more
8   comfortable.
9   Q    All right.  Did you discuss -- did you have any further
10  discussions with the defendant about his medications and
11  medical condition at that point?
12  A    Yes.  At the beginning of the interview he did mention
13  that he was on medications, although he didn't say
14  specifically what kind.  And we asked Mr. Darcy whether he
15  was capable of continuing with the interview, and he
16  indicated that absolutely he was.
17  Q    Okay.  And before you began actually asking him
18  questions about the matter at hand, did you advise Mr. Darcy
19  of has rights?
20  A    Special Agent Newton advised him of his rights and I
21  witnessed that.
22  Q    And what is -- how does the FBI typically advise
23  suspects of their rights?
24  A    The way we did it with Mr. Darcy, and the way that I
25  personally always do it, is ask the subject of the interview
```

1  to read each line of the Miranda warning, and if he

2  understands that line initial next to it, and then at the

3  end read the waiver and sign if he's willing to talk to us.

4  Q    And did he do that?

5  A    Yes.

6  Q    And he read it out loud?

7  A    He did.

8         MR. THORNELOE:  Your Honor, I'd like to approach

9  the witness now and show him Government's Exhibit 1.

10         THE COURT:  Any objection?

11         MS. SISON:  No, sir.

12         THE COURT:  Go right ahead, sir.

13  **BY MR. THORNELOE**

14  Q    I have in front of me what's previously been marked as

15  Government's Exhibit 1 that's already been admitted into

16  evidence.  Could you please describe that document?

17  A    It's an FD-395, Advice of Rights form, which we use to

18  Mirandize subjects.

19  Q    And is that the actual form that was used for

20  Mr. Darcy?

21  A    Yes.

22  Q    Was that form administered as per your standard

23  procedure you've already described?

24  A    Yes.

25  Q    Were there any irregularities about its

1 administration?

2 A    No.

3 Q    Was there anything unusual about Mr. Darcy's demeanor

4 or ability to communicate with you that day?

5 A    No.  He was measured in his decision-making.  Regarding

6 the Advice of Rights he asked a few questions.  I don't

7 recall exactly what, but he went through a thought process

8 while we were filling it out.

9 Q    So he didn't just quickly sign the form.  He seemed to

10 contemplate it?

11 A    That's correct.

12 Q    Is that a fair characterization?

13 A    Yes.

14 Q    And in your experience as a special agent for the FBI,

15 and in your previous experience as a corrections officer,

16 have you had occasion to come in to individuals who are

17 under the influence of drugs or alcohol, whether they be

18 prescription drugs or otherwise?

19 A    Yes.

20 Q    How much experience have you had in that regard?

21 A    As a corrections officer I worked in a county jail, and

22 a large portion of what I did as an officer was booking and

23 inmate classification.

24     And then for my last year and a half approximately I

25 was a corrections corporal, which is an assistant shift

1    supervisor, so I was very much involved in assigning inmates

2    to the housing units based on those types of issues.

3    Q    All right.  And in your expertise in that respect, did

4    you have plenty of opportunity to view Mr. Darcy and draw an

5    opinion about what his condition was at that point?

6    A    Yes.

7    Q    And what would you say is your opinion in that regard?

8    A    I think he was fully capable of conducting the

9    interview, and I didn't recognize any signs of him being

10   under the influence.

11   Q    Okay.  Did he ever slur his words?

12   A    No.

13   Q    Did he ever fall asleep?

14   A    No.

15   Q    Did he have trouble understanding the questions you

16   were asking?

17   A    No.

18   Q    Did he ever ask to stop the interview?

19   A    No.

20   Q    Did he have -- was he able to put events in a sequence

21   of time with respect to the questions you were asking

22   related to the incident you were investigating?

23   A    Yes.

24   Q    Did he have any trouble with doing that?

25   A    No.

1  Q    Did you make any promises to him about -- that if he

2  spoke to you and told you certain things that how a certain

3  outcome would occur?

4  A    No.

5  Q    What, if any, coercive acts did you use upon the

6  defendant?

7  A    None.

8  Q    Were you ever untruthful to the defendant?

9  A    No.

10 Q    Did he seem relieved to tell you about the things he

11 was describing?

12 A    By the end of the interview, yes.

13 Q    Okay.  Now, tell me about any questions he had for you.

14 Did he ever ask you about any of the legal proceedings?

15 A    Yes, at the end of the interview he did.  We talked for

16 approximately a half hour about the classification process

17 at the Buncombe County Detention Center; what the federal

18 process was for detention hearings and the timeline

19 regarding detention.  We talked about a number of those

20 things and we answered his questions.

21 Q    So he was able to ask -- form his own questions for you

22 all about what was going on?

23 A    Yes.

24 Q    Did he have any trouble understanding your answers to

25 those questions?

1   A    No.

2   Q    About how long did the interview last?

3   A    Approximately two hours.

4   Q    And is that a lot longer than the typical interview?

5   A    It's a standard amount of time.  I've done half an hour

6   interviews up to eight-hour interviews.

7   Q    So there's nothing unusual about the length of time?

8   A    No.

9   Q    During that time did he have the opportunity to take

10  breaks or use the bathroom if he wanted to?

11  A    Yes.  We offered him a bathroom break and a drink at

12  the beginning, and he took a drink and a bathroom break at

13  the end.

14  Q    Is there anything else about the interview you think is

15  important that the Court know?

16  A    No, sir.

17        MR. THORNELOE:  No further questions at this time,

18  Your Honor.

19        THE COURT:  Ms. Sison.

20                    **CROSS EXAMINATION**

21  **BY MS. SISON**

22  Q    Sir, it's my understanding from Agent Newton that you

23  made an appointment for him to meet you at the FBI office at

24  about 6:00 p.m.  Is that right?

25  A    That's correct.

1    Q    And your understanding is he was coming from a doctor's

2    appointment in Winston-Salem?

3    A    Yes.

4    Q    That's approximately three hours away, maybe a little

5    bit more, would you say?

6    A    Yes.

7    Q    Do you know if he had had dinner prior to meeting up

8    with you?

9    A    I don't know.

10   Q    Did you ask him?

11   A    No.

12   Q    Did you ask him if he were hungry?

13   A    No.

14   Q    Did you ask him if there was anything you could do for

15   him as far as maybe some sort of nourishment?

16   A    No.  We asked him if he needed a drink and we did offer

17   the bathroom, but we didn't speak to him about a meal.

18   Q    And the drink you gave him, I think I heard Coca-Cola;

19   was it a soda or water?

20   A    I don't recall.  It was a soda at the end of the

21   interview.

22   Q    Okay.  And did you also ask him if he needed to take

23   any kind of medication at that time?

24   A    He told us that he was on medication, and I believe

25   that his brother may have told me at the beginning that he

1    had taken the prescribed dosage of whatever medication he

2    was taking for that day and wouldn't need it until the

3    following day.  But I didn't ask him any further

4    clarification, questions about the medication because at the

5    beginning of the interview when I asked him, after he stated

6    he was on medication, if he was good to continue the

7    interview, he made a pretty affirmative declaration that he

8    was capable of understanding.

9    Q    But you are aware from at least two sources that he was

10   on some kind of medication when he was talking to you?

11   A    Yes.

12   Q    And you didn't ask him specific -- or his brother

13   specifically what those medications were?

14   A    I did not.

15   Q    And neither you nor Agent Newton asked him what the

16   effects of those medications are?

17   A     I did not past the fact that I asked him if he was

18   capable of continuing with the interview and understanding

19   what I was saying.  He said that he was.  And really that

20   was my purpose for talking to him about his medications.  So

21   once I understood that he was capable of going through the

22   interview, I didn't ask him clarification questions.

23   Q    Okay.  Now, you said you had quite a bit of experience

24   when you were a corrections officer with people coming to

25   jail for booking in whatever state they might have been,

1   whether sober or not sober.  Correct?

2   A    Yes.

3   Q    Would it be fair to say that liquor or medications

4   affect people in different ways?

5   A    Yes.

6   Q    And so I may have a drink, two drinks.  It may affect

7   me differently from the way it may affect you?

8   A    Yes.

9   Q    And so in this case you knew he was on medication but

10  you didn't know what those meds were.  Correct?

11  A    That's correct.

12  Q    And so you had no idea at the beginning of this

13  interview what effects those medication would have had on

14  him?

15  A    Well, I'll say this:  I don't have any specific

16  training on what types of medications affect people in a

17  specific way.

18       My training is based more on how a person presents;

19  whether they are showing signs of intoxication.  And he was

20  not showing any signs of intoxication.

21  Q    Okay.  But that's from your layperson's experience?

22  A    That's from my law enforcement experience.

23  Q    Okay.  And so you had not met Mr. Darcy before prior to

24  him coming to the federal building.  Correct?

25  A    No.  I had only spoken to him on the phone.

1    Q    And so you have no experience with him as far as what

2    he's like without medication?

3    A    No.

4    Q    Okay.  And I think you had said that at some point when

5    you were going over this form with him, or Agent Newton was,

6    that there was some sort of pause or hesitation, and I know

7    those aren't your words but it sounded like that to me.

8    A    I think the way I described it is a measured

9    consideration of his Miranda warnings.

10        I know from what I know about Mr. Darcy that he's a

11   previous law enforcement officer, so he has training in

12   Miranda, and he was obviously considering it, but he did not

13   invoke in any way.

14   Q    So because you knew him to be a police officer, it

15   would be your assumption that he understands Miranda?

16   A    Well, by going through Miranda he initialed that he

17   understands it.

18   Q    Right.  Did you know he had been an officer for an

19   amount of time?

20   A    I don't know how long he was, but I knew that he was a

21   school resource officer and a police officer.

22   Q    And so would it be fair to say that your understanding

23   would have been he knows Miranda?

24   A    I would expect that he received training.  I know he

25   would have to receive training in order to become a police

1  officer.

2  Q    Okay.  And so because of that, he would know Miranda

3  probably backwards and forwards in your mind?

4  A    I don't know.  But I can tell you, based on the steps

5  that we went through, he told us that he understood and he

6  initialed that he understood and then he waived.

7  Q    Okay.  But you have an officer who has been giving

8  *Miranda* rights to suspects, or people that he's arrested,

9  and yet he paused.  Did that give you any pause as to why

10 somebody with that much experience would have to think about

11 Miranda?

12 A    No.  I would expect that anyone would, given that

13 situation, consider their options as they were going through

14 the Miranda warnings.

15 Q    And your -- that's your conclusion that he was thinking

16 about his options.  But is it possible that it may be

17 because he was under some sort of influence of medication

18 that it took him that long to initial?

19 A    My conclusion is that he was advised of Miranda.  He

20 clearly initialed each line, and then waived at the end.  I

21 didn't take into account past the fact that he said that he

22 was able to understand and conduct the interview how the

23 medications related to him.  I didn't see any signs or

24 effects of medication when I observed him, and he went

25 through Miranda in what I consider a measured and

 1   understanding way.

 2   Q    Okay.  Now, this interview took place in your office.

 3   Correct?

 4   A    In our conference room.  That's correct.

 5   Q    And you are familiar with whatever equipment you have

 6   in your office.

 7   A    I don't understand.

 8   Q    For example, let me give you an example.  Do you have a

 9   computer in your office?

10   A    I do have a computer in my office.

11   Q    And I take it it would be -- you would have Internet

12   access?

13   A    Yes.

14   Q    How much time would it have been -- it have taken if

15   you asked him what medication he was on and for you to look

16   up the effects those meds would have on people?

17   A    I don't know how long it would take but, you know,

18   based on what I've already explained, I don't see the need

19   past him stating that he was on medications and was capable

20   of being interviewed and the jail policy not allowing me to

21   provide the medications, I don't understand what further

22   exploring the medications would have allowed me to do.

23   Q    I guess -- I guess perhaps it would have allowed you to

24   that what effects they would have on a person's

25   understanding of what was happening.  Would that be fair to

1  say?

2  A    Well, the effects that his medications were having on

3  him, if they were, based on my training I would observe

4  certain physical characteristics.  That's -- my observations

5  are what I would make my determination on, not by

6  researching specific medications that I don't have any

7  experience with.

8  Q    Okay.  So you had no experience with what he was taking

9  and, in fact, didn't know --

10 A    I don't know what he was taking, but I do know that

11 based on how he was presenting, and that he had no overt

12 signs that he was under the influence, that he was capable

13 of conducting the interview.  That's my conclusion.

14 Q    Now, you said you made no promises to Mr. Darcy.

15 A    I did not.

16 Q    Did Agent Newton make promises?

17 A    No.

18 Q    You didn't tell him that talking to you would be in his

19 best interest?

20 A    In general terms, yes, and I believe that, but I didn't

21 promise him anything specific.

22 Q    Well, did you tell him that it might go easier on him

23 if he spoke to you about what happened?

24 A    I did not specifically say that.  I explained to him

25 the federal Sentencing Guidelines and how the federal system

1   works regarding 5K downward departures, but we stated we

2   could not promise him anything during that interview.

3   Q    So when you talk about 5Ks, you made it clear to him

4   that if he gave information, that might help him out?

5   A    I told him that it might.  I didn't make him any

6   promises.

7   Q    And I take it that you also told him that whatever

8   information he gave you, if it was helpful, you would let

9   the prosecutor know.

10  A    Yes.  And I have.

11  Q    Okay.  All right.  Thank you, sir.

12          THE COURT:  Mr. Thorneloe.

13          MR. THORNELOE:  Nothing, Your Honor.

14          THE COURT:  Thank you very much.

15          THE WITNESS:  Thank you, Your Honor.

16          THE COURT:  Further evidence for the government?

17          MR. THORNELOE:  Nothing further, Your Honor.

18          THE COURT:  Evidence for the defendant?

19          MS. SISON:  Your Honor, could we take a few

20  minutes so I could talk to him about his right to testify?

21          THE COURT:  All right.  Make it very short because

22  I have got a load of cases and we're way behind already.  Go

23  ahead.

24          MS. SISON:  Would you rather take one of those

25  cases in place so I could talk to him, Your Honor?  Would

1     that be easier for you?

2           THE COURT:  Ms. Rauscher is here and she has a

3     plea hearing.  I can take care of that.  That ought to give

4     about 20 minutes.

5           MS. SISON:  Thank you, Your Honor.

6           THE COURT:  All right.

7           (The hearing recessed at 11:15:40 a.m. and resumed

8     at 11:38:54 a.m.)

9           THE COURT:  Let's go back into the Darcy matter.

10          MR. THORNELOE:  That would be great, Your Honor.

11          THE COURT:  Ms. Rauscher, could I see you when you

12    and Mr. Thorneloe get done?

13          MS. RAUSCHER:  Uh-huh.

14          THE COURT:  Ms. Sison, I take it you're going to

15    present evidence through Mr. Darcy?

16          MS. SISON:  Yes, Your Honor.  I just asked him to

17    go up there because of the crutches.  Thank you.

18          THE COURT:  We need to have Mr. Darcy sworn in.

19    Could you help him with that?

20          All right.  Ms. Sison, I take it you're offering

21    his testimony strictly for the purpose of the issue

22    presented in the suppression motion.  Is that right?

23          MS. SISON:  Yes, Your Honor.  I'm not asking about

24    any statements that were made, but just the surrounding

25    circumstances regarding the Miranda waiver.

```
 1              THE COURT:  And that's the sole issue.  You're not
 2   getting into any prior violations about what might --
 3              MR. THORNELOE:  Your Honor, as I see it, I reserve
 4   the right to get into questions that could illuminate to the
 5   Court whether or not he understood his -- what was going on,
 6   and whether it pertained to truth a reality.  And that --
 7   that could go further than simple circumstances surrounding
 8   what was in that room that day.
 9              THE COURT:  All right.  I'm not going to let --
10   I'm not going to let you ask him questions about what
11   happened previous -- previous to the telephone call that he
12   made to the FBI agents in which they advised him that they
13   had a warrant for this arrest.
14              MR. THORNELOE:  Your Honor --
15              THE COURT:  I think he's got a Fifth Amendment
16   right.  He has a right to testify at a suppression hearing
17   in regard to a specific issue, but he doesn't waive his
18   Fifth Amendment right about the underlying offense.
19              MR. THORNELOE:  Let me make two points, Your
20   Honor.
21              First is that I would like to ask him questions
22   about the questions that were asked and that on its face may
23   seem to be about previous issues.
24              And second, my understanding of the law is that
25   whatever testimony he gives here today would not -- would
```

1    never be admissible as to the issue of guilt or innocence at

2    a trial, but would be admissible for purposes of impeachment

3    later on.

4            And, therefore, since the rules of evidence don't

5    apply now, we could potentially get into questions that seem

6    to be about other facts as long as they pertain in some way

7    to the ultimate issue today.

8            THE COURT:  We'll see where it goes then.

9            MR. THORNELOE:  Yes, sir.

10           THE COURT:  All right of the Ms. Sison.

11                      **MICHAEL BRUCE DARCY**

12   being duly sworn, was examined and testified as follows:

13                      **DIRECT EXAMINATION**

14   **BY MS. SISON**

15   Q    State your name for the record, sir.

16   A     Michael Bruce Darcy.

17   Q    Can you hear me?

18   A    Michael Bruce Darcy.

19   Q    Can you hear me okay?

20   A    Yes, ma'am.

21   Q    All right.  Mr. Darcy, I'm going to take you back to

22   the point in time where you went to the FBI office right

23   next door to us.  Do you remember that time?

24   A    I remember that day I went, yes.

25   Q    You remember the surrounding circumstances of that day?

1    A    Yes.

2    Q    All right.  Let's start off in the morning of that day.

3         Your testimony is that you were on your way to the

4    doctor's office.  Can you tell us what happened when you got

5    that phone call from I think it was Agent Romagnuolo.

6    A    I didn't get the call.

7    Q    Who got the call?

8    A    My brother.

9    Q    Okay.  Now, why was your brother with you?

10   A    He was taking me to the doctor's.

11   Q    And this is your older or younger brother, Brian?

12   A    My younger brother.

13   Q    Okay.  Now, why was he taking you to the doctor?

14   A    Because I'm not able to drive or do anything like that

15   by myself.

16   Q    And why is that?

17   A    Because of my medication I was on.  I wasn't allowed to

18   drive; wasn't allowed to do anything like in that nature.

19   Q    When you say along that nature, are you talking about

20   driving?

21   A    No.  My brother, Brian, from the day of my accident

22   pretty much took over my care for me.  He made my

23   appointments, my doctor's appointments, all my medical

24   appointments; talked to the different agencies for me.

25   Pretty much did everything for me.

1   Q    When you say agencies, you're talking about disability?

2   A    Disability.  When I was down at his house, since I

3   didn't have any income, I applied for food stamps.  So he

4   made the calls to the social service place, arranged for the

5   interviews; either him or my sister-in-law went with me,

6   talked to the people.

7   Q    Okay.  And how long had you been with them?

8   A    How long had I been down at my brother's?

9   Q    Yes.

10  A    Since November.

11  Q    November of what year?

12  A    Of '08.

13  Q    So just last year?

14  A    Last year, yeah.

15  Q    Now, you refer to an accident.  When did that accident

16  take place?

17  A    September of last year, of '08.

18  Q    And because of that accident, what medications were you

19  put on?

20  A    I was put on a number of pain medications at first.

21  Q    Can you tell us what those medications were?

22  A    Oxycodone.  And then there was a couple other pain

23  medications on top of that at first.  One was morphine.  The

24  other one was -- there was one other type of pain medication

25  that I -- they had switched.  I can't remember what the name

1   of it was.

2       Then I was on baclofen, which is a muscle relaxer.  I

3   was on Valium, which is a muscle relaxer.  I was on

4   glycosamine for joints and -- discomfort for joint pain.  I

5   was on -- they put me on a -- just an aspirin, I think it's

6   like aspirin 386 I think the name of it was, or 368, or

7   something like that.  And then I was on -- they had me on

8   just a regular multivitamin.

9   Q    Okay.  So let's jump forward to the day that you and

10  your brother got the call from the FBI.  What medications

11  were you on at that time?

12  A    I was on the Oxycodone, the baclofen, the Valium, and I

13  took the aspirin, glycosamine and the multivitamin in the

14  morning.

15  Q    Okay.  I want to talk about the Valium.

16      How long had you been on Valium at the time you got the

17  phone call from the FBI?

18  A    I took one at 6:00 in the morning, and then I took --

19  Q    Okay.

20  A    -- one at lunchtime.

21  Q    And prior --

22  A    After I talked to the FBI.

23  Q    Okay.  Prior to that.  I'm talking about the length of

24  time from the time you were first given Valium to the time

25  you went to the doctor's on that day.

1    A    From the morning until I talked to the FBI.

2    Q    No.  Length of time.  Did you start taking Valium from

3    the time you got into the accident?

4    A    Oh, oh, oh, okay.  Okay.

5         They put me on pain medication the day of the accident.

6    The baclofen was I believe like the next -- the next day.

7    They increased my dosage of baclofen, since it takes a while

8    to take the -- to go into effect, they increased my dosage

9    from five milligrams four times a day, up until the time

10   that I met with the FBI I was on 30 milligrams four times a

11   day.

12   Q    Okay.  So you were taking that medication, the

13   baclofen, let's just concentrate on that one --

14   A    Uh-huh.

15   Q    -- from the time of the accident in September to the

16   time you had contact with the FBI in February?

17   A    Yes.

18   Q    And during that time they kept increasing the dosage?

19   A    Yes.

20   Q    And what was that medication for?

21   A    It was to control muscle spasms, and it was a muscle

22   relaxer that relaxed your muscles to prevent the spasms.

23   Q    And did it work to relax your muscles?

24   A    It did.

25   Q    Did it affect any part of you?

1   A    It affected all of my muscles, not just the problems

2   where I was having on my leg, but the rest of my muscles

3   also; hand, arm muscles; sitting down, things like that.

4   Not just my spasms that I was having.

5   Q    Did it have any affect on your mind?

6   A    Yes.

7   Q    Tell the Court what that effect was.

8   A    Well, I don't know if it was just the baclofen or a

9   combination of all of the -- of the drugs, but I couldn't

10  really understand what people were saying to me.

11      I would look at them as they were talking, but it would

12  kind of go right past in what they were saying.  And I would

13  just usually just nod my head yes or whatever.  And

14  sometimes it would make me just kind of look off and -- with

15  a blank stare on my face.

16      I had trouble paying attention.  Like when we watch TV,

17  different shows would be on, and I couldn't remember what

18  was -- what was happening in the show.  We would play cards

19  at my brother's house, but I would lose track in the middle

20  of the card playing of what was actually going on.

21  Different things like that.

22  Q    And had you taken baclofen that morning?

23  A    Yes.

24  Q    How many dosages did you take -- doses did you take?

25  A    That morning?  Of baclofen, 30 milligrams.

1   Q    What time?

2   A    About 6:00 in the morning.

3   Q    And did you take any prior to the FBI interview?

4   A    Yes.

5   Q    And what time was that?

6   A    It was right before we got into Asheville.  I would say

7   probably 5:30-ish or so.

8   Q    And you also mention Oxycodone.  What was the purpose

9   of that drug?

10  A    That Oxycodone is a pain -- a pain medication.  I was

11  having pain in my left knee, my back muscle that they

12  operated on, and my right hand and wrist that they operated

13  on for pain.

14  Q    And how long have you been on Oxycodone from the time

15  it was prescribed to you until the time the FBI saw you?

16  A    They changed -- they changed my pain medication.  My --

17  I think they changed it to the Oxycodone in October I'm

18  wanting to say.  They had me on some other types of pain

19  medication but they weren't strong enough so they changed it

20  to Oxycodone.

21  Q    And the day that you had contact with the FBI, how many

22  milligrams were you taking?

23  A    I'm not really sure of how many milligrams of the

24  Oxycodone I was taking.

25  Q    How many did you --

1          THE COURT:  Stop, and I hate to interrupt you, but

2    I'm looking here and I say Mr. Banzhoff has a matter that's

3    scheduled for 11:00.  It's now 11:55.  And he's taken time

4    out from his law practice to help us by being on the

5    court-appointed list, and I look over to my right and I see

6    Mr. Belser and he's got a matter set for 11:40.  He's in the

7    same situation.

8          Let's do this:  I'm going to take a recess in this

9    hearing.  I'm going to take care of Mr. Banzhoff.  Then I'm

10   going to take care of Mr. Belser.  Then we're going to come

11   back to the hearing.  Because I think this is going to take

12   a period of time, and I know these gentlemen are both used

13   to in our court coming in at a specific time and being able

14   to have their case handled more or less at that time.  And

15   they've probably got plans and things in their law practice

16   that they need to take care of.  And I think that's just the

17   right thing to do.

18         Let's take a recess in this.  Bring out Leroy

19   DeAngelo Darity.  And Ms. Ford, I'm sorry.  I may require

20   you to stay here a lot longer than what you planned.  I need

21   to do this for these gentleman.  They really help us.  I

22   like having you here and I'm going to keep you here awhile.

23   Okay.

24         (Hearing recessed at 11:54:47 a.m. and hearing

25   resumed at 12:49:05 p.m.)

1          THE COURT:  All right.  Will the record show we're

2    going back into the testimony in regard to the motion to

3    suppress in the case of United States of America v. Michael

4    Bruce Darcy.

5          Before we go further, let me provide to the --

6    counsel for the defendant, and also to the government, some

7    cases -- some information.

8          It would appear to me that the issue is not the

9    degree to which perhaps Mr. Darcy had taken controlled

10   substances, medication in the past.  It's whether or not any

11   statement that he made by him was as a result -- was

12   involuntary because the government committed some type of

13   coercive conduct.  But let's -- I think we need to get on

14   point and move along in that regard.

15         Go ahead, Ms. Sison.  I think we talked about --

16   the last question was:  Was he taking any Oxycodone on the

17   day of his contact with the FBI in February.

18   **BY MS. SISON**

19   Q    Okay. Mr. Darcy, did you get a chance to answer that

20   question?  How much Oxycodone had you taken that day?

21   A    I'm not really sure.  It was one pill.  I wasn't in

22   charge of my medication, my sister-in-law was.  She

23   dispensed it to me.  Since I couldn't remember when to take

24   my medication, she gave me the pills.  I can't remember like

25   what milligram that was.

1       The only reason why I remember the baclofen is that the

2  doctor steadily increased it.  When it got to 30 milligrams,

3  they said that was like the maximum dose they could give me.

4  Q    Okay.  And so when you were asked to go to the FBI

5  office at 6:00 p.m. later that day, what did you believe the

6  purpose of your going there was for?

7  A    They told me I was going to jail.  That I had to spend

8  the night in the Buncombe County Jail, and then come to

9  court the next morning.

10 Q    And did you believe that they were going to interview

11 you?

12 A    No.

13 Q    Okay.  And so do you know why your brother left?

14 A    They told him he couldn't stay.

15 Q    And did you want him to stay?

16 A    Yes.  Of course.

17 Q    Okay.  So you heard the testimony of the agents where

18 they talked about speaking to you for about a half hour or

19 maybe 45 minutes before you -- before they presented the

20 waiver to you.  Correct?

21 A    I heard that, yes.

22 Q    Okay.  Is that an accurate timeline?

23 A    I didn't -- I didn't even think I was there more than

24 15 minutes total from the time I got there from the time I

25 left so I ...

1  Q    Okay.  So prior to your -- to your being presented the

2  waiver, how were the agents treating you?  And let's go

3  first to Agent Newton.  That's the first agent who

4  testified.  How was he treating you prior to the presentment

5  of the waiver form?

6  A    He met us at the door.  Well, both of them met us at

7  the door outside.  As far as I remember, they treated me

8  okay.  I don't remember them saying anything bad to me when

9  I first got there.

10  Q    What about after your brother left, how did they treat

11  you?

12  A    Well, they pretty much told me, you know, to come in

13  this room, you know, to come over here and then sit down

14  here, and that's pretty much all I remember.

15  Q    What were you feeling at that moment?

16  A    I wasn't really feeling very much.  I thought that I

17  was being taken to the Buncombe County Jail.  I didn't know

18  where I was going.

19  Q    What about when they started to talk to you, how do you

20  think the agents were treating you?

21  A    Well, they -- they -- they were telling me that I had

22  to do this and I had to do that, so as far as I remember

23  I -- that's just what they were saying.

24  Q    Did you feel you had any options to not do what they

25  asked you to do?

1    A    No.

2    Q    And why is that?

3    A    Well, it's because I had been doing -- since my

4    accident I had been doing pretty much what everybody has

5    been telling me because I've not been able to do anything on

6    my own.  So whenever someone says, "Do this," that's what I

7    have been doing.  I have been doing that since September.

8    Q    And so when they presented the piece of paper to you

9    with the Miranda warning, how were they treating you at that

10   point?

11   A    Pretty much the same.  They told me to -- they said

12   read each thing, I think, and initial it and sign it.

13   Q    Did they act in a way that made you frightened or

14   apprehensive?

15   A    I was -- yes, I was very nervous and afraid that they

16   were -- I wasn't sure what was going on.

17   Q    What did you think was going to happen if you didn't

18   sign that form?

19   A    Well, at the time I don't think I really felt anything.

20   I don't even remember signing the form.  I don't know what

21   would have happened.

22   Q    Did you feel at any time that you could talk to another

23   person?

24   A    Yes.

25   Q    And did you ask to talk to another person?

1    A    Yes.

2    Q    And what did you request?

3    A    I asked that I should talk to somebody before I do

4    anything.

5    Q    And did that come before you signed the waiver form or

6    did that come afterwards?

7    A    That was before, when I first walked in there, the

8    first thing I said.

9    Q    And were you given the opportunity to call somebody?

10   A    No.

11   Q    Okay.  Before you signed the form, were you given the

12   opportunity to call anybody else?

13   A    No.

14   Q    Okay.

15        MS. SISON:  Thank you.

16                  **CROSS EXAMINATION**

17   **BY MR. THORNELOE**

18   Q    Mr. Darcy, you've work as a police officer.  Right?

19   A    That's correct.

20   Q    How long were you a police officer?

21   A    Since 1999.

22   Q    So how many years of service as a police officer is

23   that?

24   A    Until 2007, so eight years.

25   Q    Eight years you said?

1    A    Yes, sir.

2    Q    And where were you a police officer?

3    A    Beech Mountain was my primary employer, and then I did

4    work part-time for several other different departments.  One

5    was the Sugar Mountain Police Department, I worked part-time

6    there, and I worked some for Avery County Sheriff's

7    Department.

8    Q    Okay.  What did you do for the Avery County Sheriff's

9    Department?

10   A    I filled in over at the school as a resource officer.

11            THE COURT:  Which of the --

12            THE WITNESS:  Avery County High School.

13            THE COURT:  Avery High.

14   **BY MR. THORNELOE**

15   Q    And in your duties as a police officer, did you ever

16   arrest anyone?

17   A    Yes.

18   Q    How many times would you say?

19   A    Hundreds.

20   Q    Hundreds of times.  And when you gave -- when you

21   arrested someone, did you ever advise them of their rights?

22   A    Yes.

23   Q    What did you advise them?

24   A    Their *Miranda* rights before they -- before I asked them

25   any questions.

Q     Okay.

        MR. THORNELOE:  Your Honor, at this time I would

like to approach the witness and show him Government's

Exhibit 1.

        THE COURT:  Any objection?

        MS. SISON:  No, Your Honor.

**BY MR. THORNELOE**

Q     Now, you said you advised him of the *Miranda* rights.

Right?

A     Yes, sir.

Q     Previously with other arrests?

A     Yes, sir.

Q     Were they similar to these rights here?  And I'm now

showing you Government's Exhibit 1.

A     They were pretty similar.  They were on a little blue

card.

Q     Okay.  So statements on Government's Exhibit 1 you're

personally familiar with through your experience as a police

officer?

A     Yes.

Q     All right.  And you said you gave those rights hundreds

of times.

      What do you understand when someone waives their

*Miranda* rights, what do you understand that to mean?

A     That they are giving up their right to counsel.

1    Q    And that they are willing to make a statement to law

2    enforcement officers?

3    A    To me, yes.

4    Q    And that the statements that they make can be used

5    against them in court.  Right?

6    A    Yes.

7    Q    All right.  Let's back up just a little bit.  That day

8    you said you were on Oxycodone.

9    A    Yes.

10   Q    All right.  And you gave -- you gave specifically the

11   dosage that you were on, right?  What did you say that was?

12   A    Not of Oxycodone.  I don't know.

13   Q    Okay.  What about baclofen?

14   A    30 milligrams each time I take it.

15   Q    A you took is the first time when?

16   A    6:00.  About 6:00 in the morning.  And then another

17   dose --

18   Q    About 5:30 p.m. --

19          THE COURT:  Let him finish his answer,

20   Mr. Thorneloe. Go ahead and finish your answer.

21          THE WITNESS:  Around lunchtime, and then around

22   5:30 p.m. that evening.

23   **BY MR. THORNELOE**

24   Q    And you remember doing that?

25   A    I remember taking my pills that my sister-in-law gave

1   me.  They were the same color and same pills I had been

2   taking, so I didn't -- I didn't dispense my own medication.

3   Q    All right.  And what medications are you taking today?

4   A    I'm taking ibuprofen for inflammation of my knee and

5   then they are giving me some type of little pill for my

6   stomach.

7   Q    Okay.  You're not taking baclofen now?

8   A    No.  They have not supplied me with that.

9   Q    Are you taking narcotics?

10  A    No.

11  Q    When you got to the FBI building there, the government

12  building, on February 24th, do you remember how you got

13  there?

14  A    My brother.  My brother drove me.  I thought -- I

15  thought that was the Buncombe County Jail.  I've never been

16  here before.

17  Q    But they didn't handcuff you, did they?

18  A    No.

19  Q    A when you went through security, how did you go

20  through security?

21  A    I stood there and they brought the wand over to me and

22  I didn't go through the detector.

23  Q    Okay.  And you remember them wanding you?

24  A    I remember them wanding me.  I'm just standing there.

25  Q    And from there you went over into the FBI office,

1  right?

2  A    I went -- they took me down the hall to an office, yes.

3  Q    Okay.  And when you walked into that office, did you go

4  into a conference room?

5  A    I heard them say something about a conference room but

6  I can't describe what was in the room except --

7  Q    But you sat at a table, right?

8  A    The table and the chairs.  I don't remember what was on

9  the wall or anything like that.

10  Q    Was the table sort of an oval table?

11  A    I can't remember.  I think it was a rectangle.

12  Q    Okay.  Did you sit on the end of the table?

13  A    As soon as I walked in, I took the first chair I came

14  to.

15  Q    And you had the agent on your left?  Did you have an

16  agent on your left?

17  A    I believe one sat on both sides I think, yes.

18  Q    Did they let you go to the bathroom?

19  A    I -- I heard them say they did, but I can't remember

20  going to the bathroom --

21  Q    Okay.

22  A    -- when I first got there.

23  Q    Did you want to go to the bathroom and they didn't let

24  you?

25  A    I can't remember wanting to go to the bathroom when I

1   was there.

2   Q   All right.  You remember signing that waiver form,

3   right?  You said that they put a form in front of you and

4   you read the statements aloud.

5   A   I don't remember actually signing the waiver.  The

6   first time -- the first time I seen that was when my

7   attorney showed it to me.

8   Q   Do you remember reading the statements aloud?

9   A   I remember them telling me to read something but I

10  can't tell you if that's what I read.

11  Q   Okay.  I want to show you that exhibit one more time.

12          MR. THORNELOE:  If I may approach the witness one

13  more time, Your Honor?

14  Q   If you look at this statement, do you see the initials

15  next to each statement?

16  A   Yes, I do.

17  Q   And what are those initials?

18  A   "MBD."

19  Q   And what does that stand for?

20  A   "Michael Bruce Darcy."

21  Q   Okay.  And where it says down here "signed," what do

22  you recognize there?

23  A   That's my signature.

24  Q   That is your signature?

25  A   Yes, sir.

1   Q    And that night the special agents asked you a series of

2   questions, didn't they?

3   A    I don't remember them actually asking me questions;

4   more or less telling me, telling me things.

5   Q    Well, do you remember them asking you about a

6   relationship with Kendra Johnson?

7            MS. SISON:  Objection, Your Honor.

8            THE COURT:  Overruled at this time.

9   A    I remember them asking me something about that, but I

10  can't --

11  Q    Okay.  Do you remember them asking -- they asked you

12  Kendra's birthday, and you responded that it was

13  September 15th, 1991.

14  A    Can you say it one more time?

15  Q    Do you remember them asking you what Kendra's birthday

16  was, and that your response was, "September 15th, 1991"?

17  A    No.

18  Q    And that is correct, right?

19  A    That's correct, yeah, but I don't remember them asking

20  me that.

21  Q    Okay.  And you remember them -- do you have remember

22  them asking you when you first had a sexual relationship

23  with Kendra?

24           MS. SISON:  Objection, Your Honor.

25           THE COURT:  I'll hear you.

1          MR. THORNELOE:  I'm sorry, Your Honor?

2          THE COURT:  I'll hear Ms. Sison's objection.

3          MS. SISON:  Your Honor, what we're here for is to

4    determine whether or not at the time he signed the Miranda

5    waiver whether he knowingly and voluntarily waived that.

6          What happens afterwards has no bearing on what

7    happened before.  And I understand where he's coming from as

8    far as using what happened after to show that perhaps he

9    knew what was going on before.  But again, it didn't happen

10   beforehand, and he's asking specific questions as to what

11   was said a not said.

12         Now, he can ask -- if he wants to ask general

13   questions about what he was feeling and that sort of thing,

14   that's one thing.  But now we're getting into specifics of

15   what questions were answered and what he responded to it.

16   And I don't see how that has any bearing on whether he

17   knowingly and voluntarily waived his *Miranda* rights.

18         MR. THORNELOE:  Your Honor, what I'd like to make

19   inquiry into is a series of questions that were asked

20   immediately after this Miranda waiver, which he has

21   confirmed that he's the one that signed it, and what that

22   has to do with is whether or not he place in a sequence of

23   time a series of questions that will clue the Court as to

24   whether or not he understood the nature of the proceedings.

25         So if someone is asking incriminating questions,

1   then if you can respond with questions -- answers about

2   times, then that can tell the Court something about what was

3   going on.

4          MS. SISON:  It tells the Court something that

5   happened afterwards.

6          THE COURT:  This is not about time.  The previous

7   question that you asked him that I allowed was about time,

8   about a birthday.  So that's why I allowed that.  Now we're

9   getting into something else.

10          MR. THORNELOE:  Your Honor, I want to see if the

11   defendant can place in a series -- he -- in his confession,

12   he makes a detailed statement about a relationship and puts

13   everything in a particular time sequence which we believe

14   fits with the facts.  And so if he remembers doing that,

15   then that tells the Court that, in fact, he was able to

16   orient himself in time and place and related events, and if

17   he can do that, that makes sense he would also be lucid and

18   aware of what was going on.

19          MS. SISON:  Well, first --

20          THE COURT:  I'm going to sustain the objection.

21   I'm not going to allow you to ask him any questions about

22   the underlying statement.  What we need to concentrate on is

23   any recollection that he has about any coercive behavior or

24   acts on the part of the officers that overcame his free will

25   to --

 1           MR. THORNELOE:  Your Honor --

 2           THE COURT:   -- give up his rights and sign this

 3   document and to answer questions.

 4           MR. THORNELOE:  Yes, Your Honor.  I believe that's

 5   important.

 6           However, I think that's just one prong of what

 7   this Court needs to investigate today.  I think voluntary,

 8   that is a prong that goes to coercion.  An if you have

 9   coercion, then that deals with voluntary.

10           But as far as knowingly and intelligent goes, I

11   think the Court still needs to make -- it's still reasonable

12   to make inquiry into whether he understood what these

13   questions were about and the incriminating nature of them

14   and someone who, if he understands, knowing that they were

15   incriminating questions they were asking about, then he

16   will -- can be found to be knowing and intelligent.

17           THE COURT:  Has he already testified that he

18   understood what the questions were about; whether he wished

19   to give up is right to counsel; whether he understood that

20   the evidence could be used against him, and whether he

21   wanted a lawyer.  I believe in response to your questions he

22   said, "Yeah, I am --" that -- as a matter of fact, in

23   response to your questions he said that's what he understood

24   the rights were about.

25           MR. THORNELOE:  Yes, sir.

1        THE COURT:  Shows he understood it.

2        MR. THORNLOE:  Well, he was somewhat dodgy about

3   that.  He doesn't claim he completely remembers saying those

4   things.

5        I'm just trying to establish that this was not

6   just two agents talking to somebody.  There was a dialogue,

7   and this was somebody who was in the room and aware of what

8   was going on.  And I think discussing what he said to the

9   agents tells the Court whether or not he was involved in

10  that conversation, and, therefore, was making knowing and

11  intelligent responses rather than just nodding yes or no or

12  whatever else he might claim.

13       THE COURT:  I'm going to sustain the objection.

14  I'm not going to go back and revisit.

15       MR. THORNELOE:  Yes, Your Honor.

16       THE COURT:  Go ahead, sir.

17  **BY MR. THORNELOE**

18  Q    Are you on any pain medications today?

19       THE COURT:  Hhmm?  Do what?

20       MR. THORNLOE:  I'm asking the defendant if he's on

21  any pain medications today.

22       THE COURT:  Oh, I'm sorry.  I thought you directed

23  the question at me.

24       MR. THORNELOE:  I'm sorry, Your Honor.

25       THE COURT:  Go ahead.  Mr. Darcy, answer the

1    question.

2    **BY MR. THORNELOE**

3    Q    Are you on any pain medications today?

4    A    I took the ibuprofen this morning, but it's not for

5    pain; it's for swelling from my -- for my joint and my knee

6    what they are giving it to me for.

7    Q    You don't recall anything that the agents did that day

8    that would be -- that was coercive to you, do you?

9    A    They -- they told me, as far as I remember, when we sat

10   down there, they put something in front of me and told me --

11   as far as I can remember -- read each one of these out loud,

12   initial and sign it I guess.

13   Q    And those are the --

14   A    And that's like me trying to think back of what

15   happened.  Because later that afternoon -- later that

16   evening I called my brother.  My time frame was about 30

17   minutes.  He said to me, "Did you talk to anybody?"

18        I said, "No."

19        He said, "Did you sign anything?"

20        I said, "No."

21        Not until the next day or a couple days later, when my

22   attorney -- well, I actually believe I told my attorney I

23   didn't -- not until they showed me the paper that that's

24   what the paper was.

25   Q    But you told me that you'd read people those rights

1  hundreds of times in your career.  Right?

2  A    When I was working I was never under medication.  So

3  when I read rights to people, I was always alert and on the

4  job.  I was never under any influence when I read rights to

5  people and expected answers.

6  Q    You didn't ask for an attorney during that

7  conversation, did you?

8  A    I asked -- not the those words.  I asked -- I said

9  something to the effect that I want to talk to somebody

10  before I talk to anybody.  I think that's my first words.

11  Q    Do you remember asking questions about the pending

12  procedures for you the next day, such as your initial

13  appearance, that sort of thing?

14  A    I don't remember asking them any questions.  I don't

15  remember -- I remember the first agent that was here.  The

16  second agent, I couldn't tell you what he looked like if I

17  passed him in the hall.  I don't remember him.

18  Q    So basically your memory is pretty good up until the

19  point where you got wanded.  And then at that point, once

20  you start talking to the agents, everything gets vague, and

21  then you remember talking to your brother the next day in a

22  phone call?

23  A    No.  I remember bits and pieces of it.  I remember

24  going in.  I remember driving -- you know, him driving me up

25  to the building.  I don't really remember any conversation

1    that was going on right then.

2        I do know that I had to get my brother to write down

3    his phone number on a piece of paper for me because I

4    couldn't even remember my own brother's phone number.  They

5    gave him a piece of paper and a pen.  Because even my own

6    brother, I've known for 40-some years, I couldn't remember

7    his phone number.

8        Going into the room I remember walking somewhere into a

9    room, but that's -- I couldn't tell you where that room was

10   or how far it was or anything like that.

11   Q    But you do remember getting that piece of paper in

12   front of you and reading those statements aloud?

13   A    They put something -- the only reason why I remember

14   that is that's the only thing they put in front of me.

15   That's the only thing I remember being -- saying here, put

16   in front of me.  Nothing else, as far as I remember, was

17   presented to me.

18   Q    What do you remember after the Miranda statement?

19   A    I remember, we was -- sat there at the desk or at the

20   table.  They did say -- they did say they had a warrant for

21   me.  And that they were -- taking me to the Buncombe -- I

22   was going to have to spend the night in Buncombe County

23   Jail.  I don't remember going to the bathroom.  I don't

24   remember having a drink.  Like I said, I thought only

25   probably like 30 minutes went by, maybe not even that much.

```
1   Q    So you don't remember what the room really looked like

2   when you walked in there?

3   A    No.

4   Q    And you don't remember taking a drink?

5   A    No.

6   Q    And you don't remember going to the bathroom?

7   A    I heard them say that but that's -- I don't remember

8   doing that.

9   Q    And there's a sheet of paper you don't remember at the

10  time but now you recognize that those were indeed your

11  initials and signature.  Right?

12  A    Really only after I looked at it, my attorney showed it

13  to me.  If she didn't show that to me, I wouldn't

14  remember -- I wouldn't remember that because I told her and

15  my brother that I didn't sign anything.

16  Q    So you don't remember signing it.  Right?

17  A    I don't remember actually signing that.

18  Q    You don't remember the questions the agents asked you,

19  but you do --

20  A    To talked, but I can't -- I can't tell you any

21  specific question that they asked.

22  Q    So you don't remember making admissions about --

23            MS. SISON:  Objection, Your Honor.

24  Q     -- the underlying offense?

25            MS. SISON:  Objection.
```

1         THE COURT:  I didn't get to hear his question.

2  Q   You don't remember making admissions about the

3  underlying offense?

4         THE COURT:  Overruled.  I won't let you go any

5  further than that.

6  A   I don't.

7         THE COURT:  Go ahead and answer the question.

8         THE WITNESS:  I don't remember making any

9  statements or anything like that, no.

10  **BY MR. THORNLOE**

11  Q   You don't remember them asking questions about the

12  court procedures or staying at the jail or anything like

13  that?

14  A   I know at sometime -- it was either prior -- either

15  producer or after, or both, that we -- that they told me I

16  was going to Buncombe County Jail.

17  Q   You don't remember asking them any questions at all?

18  A   I don't believe I asked any questions at all.  I don't

19  remember asking any questions.  They did all the talking.

20  Q   All right.  So after you were done with this meeting

21  with the FBI agents, what's the very next thing you

22  remember?

23  A   Being drove over to the jail.

24  Q   What about processing into the jail, do you remember

25  getting signed in and booked into the jail?

A    I remember -- I remember parts of it.  They brought me
over there.  I sat down.  I mean I couldn't tell you what
station I went to or anything like that.  At some point I
guess they took my property.  Didn't have anything on me
anyway.  They made me give it all to my brother.

Q    You had never told those agents that you were on any
drugs that were altering your ability to speak or recall
events, did you?

A    I -- I don't remember actually me saying that.  I think
my brother -- my brother told them -- I think, I didn't hear
any conversation on that.  I did send a -- an e-mail.

Q    Sent an e-mail when?

A    Prior -- the agents went up to Boone to talk to a
detective up there that I know.  And the detective was
wanting to talk to me.  And my brother helped me write an
e-mail to him telling him that I was going out to -- out to
the hospital to have my leg looked at.

     And that -- I had talked to the detective before, but I
couldn't remember what we talked about.  And so I, in my
e-mail, I told him that, you know, I don't remember what we
discussed, and that he can contact me at a future date, and
that I was going out to -- to the hospital on Tuesday.

Q    So you can't say that you ever told the agents yourself
that you were on any pain medications?

A    I don't remember saying -- I don't remember saying that

1    I was on pain medication.

2    Q    You didn't tell them you weren't able to talk to them

3    because of your mental condition or your medicines

4    themselves?

5    A    I didn't say that.  I heard -- I heard the agents say

6    that I told them that I was on medications, but I don't

7    remember saying that to them.  He does but I don't.

8            MR. THORNELOE:  No further questions right now,

9    Your Honor.

10            MS. SISON:  None, Your Honor.

11            THE COURT:  Let me ask you this:  You said that

12    the officers -- the agents told you -- this is in response

13    to questioning by your -- Ms. Sison, your attorney -- the

14    agents told you you had to do this and you had to do that.

15    What was the "this" that the agents told you to do, and the

16    "that" the agents told you that you had to do.

17            THE WITNESS:  Yes.  The first -- the first call to

18    us was to my brother.  I didn't take that call.  My

19    brother -- my brother talked to my cousin a lot, who is the

20    sheriff.  And he apparently gave my brother the number to

21    the agent.  But the agent -- my brother called the agent and

22    had a discussion with him.

23            I -- after that, I called my detective friend at

24    Boone PD and asked him what was going on.  He put me on the

25    phone with one of the agents.  I couldn't tell you which one

1   it was.

2            THE COURT:  Agent Newton or Agent Romagnuolo.

3            THE WITNESS:  It was one of those.

4            He said that -- he said that he had a warrant for

5   me, and that he wanted me to turn myself in.

6            And I asked if I could go up to Boone to turn

7   myself in.  And he said -- he said no.  And then he said

8   that, "You have to turn yourself in at Buncombe County

9   Jail."  And I said -- I said okay.

10           And then when we got to the building, when we came

11  over here, he was pretty much instructed me to do, you know,

12  when I got out of the car, "Come in here.  Go over to the

13  metal detector."  That's pretty much all --

14           THE COURT:  This is Agent Newton or

15  Agent Romagnuolo?

16           THE WITNESS:  It was either one.  It was one the

17  two.  I don't really remember which ones as far as I can

18  remember.

19           And then going into the room -- really the only

20  thing -- I remember them, they are talking, but the only

21  thing I really remember was the paper, they put the paper

22  down, and they said read this paper, or read this out loud.

23  So I did.  And I don't actually remember them saying initial

24  it but -- and then sign it.  And that's just -- that's

25  from -- not from actually when it happened.  That was

1   several days later that I -- trying to piece what happened

2   that evening at the place -- because I couldn't remember --

3   when I talked to my brother later on that night, and then

4   even the next day when I talked to my attorney, I didn't

5   remember at that time even doing that, not until I saw the

6   paper that that's apparently what I did.

7           THE COURT:  All right.  Any other instructions

8   where you contend the agents told you you had to do this or

9   that.  Anything else from the agents?

10          THE WITNESS:  I don't remember anything else.  I

11  don't remember really anything else the agents had even said

12  to me that night.

13          THE COURT:  Now, when you had the conversation

14  with the agent on the telephone where he told you that --

15  either Agent Romagnuolo or Agent Newton told you that you

16  had to come to the Buncombe County Sheriff's Office, what

17  medications had you taken within the previous 48 hours, if

18  you can recall?

19          THE WITNESS:  Well, that morning.  I took the

20  medications that morning.

21          THE COURT:  Give me a list of them.

22          THE WITNESS:  It was the same medications.  It was

23  the Oxycodone, the baclofen, the Valium, glycosamine,

24  aspirin, multivitamin.  But that was at 6:00 in the morning

25  and I don't think --

1         THE COURT:  What's glycosamine for?

2         THE WITNESS:  It's for joints.  It's for my knee

3    joint inflammation.

4         THE COURT:  All right.  What was the baclofen,

5    what was that for?

6         THE WITNESS:  Baclofen us a muscle relaxer, and it

7    helps control when I was -- when I was injured, my leg did

8    involuntary spasms, my injured leg.  And that -- and the

9    Valium helped relax me.

10        THE COURT:  So you took the Valium to help relax

11   your leg.  What did you take Oxycodone for?

12        THE WITNESS:  For the pain in my knee and my hand.

13        THE COURT:  Now, in regard to this condition --

14        THE WITNESS:  What condition, Your Honor?

15        THE COURT:  That you described and that the agents

16   described, the palsy.  Do you have epilepsy?

17        THE WITNESS:  No, Your Honor.  It's cerebral

18   palsy.  I was born with it on my left side.

19        THE COURT:  So you have had that all --

20        THE WITNESS:  Since birth.

21        THE COURT:  Since birth.

22        THE WITNESS:  And the only reason that it

23   interfered or that it's interfering with -- is that I

24   injured -- I happened to injury my left side of my body,

25   which that's what it -- cerebral palsy affects.  And when I

1  get injured either on my arm, my chest, my hand, my left

2  side down to my leg and my ankle, my muscles on that side

3  only will spasm, and they spasm to the extent where they

4  operated on my leg.  And when I got done with the operation,

5  they had me in a cast, but my leg was spasming so much that

6  it tore the skin off of my ankle and started bleeding.  So

7  they had to remove the cast.  And when they removed the

8  cast, they put me in a -- like a temporary brace that you

9  wear when you have knee surgery.  But when they did that, it

10 freed up my knee and the spasms were actually so severe that

11 it ripped the surgery apart that they did.  And that's what

12 the -- that's why they had increased the baclofen to such a

13 high dose.  They also Botoxed my muscles.  I didn't consider

14 that a drug, but they Botoxed my muscles on my left side.

15          THE COURT:  Let's go back and review.

16          You had taken Oxycodone on the day that you were

17 arrested and gave a statement.

18          THE WITNESS:  Uh-huh.

19          THE COURT:  You had taken Oxycodone, baclofen,

20 Valium, and then you -- there was another drug.

21          THE WITNESS:  Glycosamine.

22          THE COURT:  Glycosamine.  What did you take that

23 for?

24          THE WITNESS:  That's for my knee.  That's for

25 joints.  That's for joints.

1          THE COURT:  And aspirin.

2          THE WITNESS:  Aspirin they prescribed, and a

3  multivitamin.  And I took -- I take my first dose when I get

4  up.

5          THE COURT:  First dose of which?

6          THE WITNESS:  Of all of it.  Of all of the

7  medications.

8          THE COURT:  Okay.

9          THE WITNESS:  And then I take another dose.

10          THE COURT:  We're talking about on the day this

11  happened.

12          THE WITNESS:  On the day it happened.

13          THE COURT:  You take your medicines when you get

14  up.

15          THE WITNESS:  And then after -- after I talked to

16  the agent, and it was around lunchtime -- it was before

17  lunch, right around lunchtime when I talked to the agent,

18  and it was right after that that I took my next dose.

19          Because when I called them, they were at lunch.

20  And then we went to lunch.  And I took my next dose after I

21  ate.  And then my next dose I take is in the evening.  And

22  we didn't stop.  We told them that we would be there.  My

23  brother told them we would be there at 6:00, and we were

24  pretty much pushing the time so we didn't -- we didn't eat.

25  We didn't stop and eat.  And so I took my next dose before,

1     right before I got there.

2             THE COURT:  All right.  What does your brother do

3     for a living?

4             THE WITNESS:  He works for Verizon telephone.

5             THE COURT:  What does he do for them?

6             THE WITNESS:  He works in the office.  He's like

7     their controller type -- troubleshooter.

8             THE COURT:  Let me ask you this:  I notice that

9     you have a very clear recollection of the telephone

10    conversations but -- of your recollection earlier in the

11    day, but you don't have a good recollection of what occurred

12    during the interview between you and the officers.  Were you

13    on the --

14            THE WITNESS:  That's correct.

15            THE COURT:  Were you on the same medicine?

16            THE WITNESS:  Yes.

17            The medicine wears off after about four, five

18    hours.  So right after I take the medication, it's more --

19    it's more severe right when I take my medications than it is

20    when it's wearing off, when I have to take the new set.

21            I only had one conversation with the agents.  And

22    that's when I called to Boone.  And that was before I took

23    my next set of medications.  The rest of them was with my

24    brother.  The agents talked to my brother.  Because even

25    when we got out to the hospital, I had already taken my

1   medication.  My brother always goes in with me to the doctor

2   because I can't remember what actually the doctor

3   instructions actually are.  So he handled all of that.  He

4   handled all of that stuff with me.  I had no conversation

5   really with any of my doctors without my brother present.

6   My brother handled all of my medication for my medical

7   issues, making my appointments, doing all that -- the

8   things.  I didn't even -- I didn't go into any of my

9   appointments without my brother there.

10          They wouldn't let me drive.  They wouldn't let me

11  pretty much do anything.  I mean, I -- I was in the bed at

12  the house, and I got up in the morning and my sister-in-law

13  made breakfast for me.  I couldn't cook.  She -- she set

14  food out for me if she wasn't there, she had to run to town.

15  Several times I forgot to even eat.

16          THE COURT:  Mr. Thorneloe, anything further

17  questions of the defendant?

18          MR. THORNELOE:  No, sir.

19          MS. SISON:  No, Your Honor.  Thank you.

20          THE COURT:  Thank you very much, Mr. Darcy.  I'll

21  let you return to your seat beside your counsel.

22          Ms. Sison, further evidence for the defendant?

23          MS. SISON:  No, sir.  We're through.  Thank you.

24          THE COURT:  Any rebuttal evidence from the

25  government?  And Mr. Thorneloe, I will tell you, I will

allow you to introduce -- if you've got an agent here that

can identify the statement given by the defendant so that I

can have some idea about the recollection of the defendant

as set forth in the statement.

MR. THORNELOE:  Yes, Your Honor.  I would will you

to call Special Agent Newton for that purpose.

THE COURT:  Is he here?

MR. THORNELOE:  He still is, Your Honor.

THE COURT:  Do you want to stipulate the -- about

the statement?

MS. SISON:  No.  Actually, Your Honor, I would

object to the inclusion of that.

First, it's the government -- it's the

government's witness's statement, not his.  That's what he's

saying that he recollects from that so that's not

necessarily his.  He didn't adopt it.

Secondly, this all took place after the Miranda

warnings were made, and I don't think it's relevant to the

issue of whether or not at the time he signed off on that

waiver was that voluntarily and knowingly made.

THE COURT:  This is the statement of the defendant

but it's -- the defendant didn't sign it when presented to

him.

MR. THORNELOE:  Your Honor, what the statement

would say, of course, it would be that this is Agent

1    Newton's summary of what occurred, and the Court is correct,

2    that the defendant did not personally review this statement

3    and sign it himself.  But rather it's a memorialization of

4    interview by Agent Newton and would go towards letting --

5    alluding to the Court exactly how detailed the statements

6    that Mr. Darcy made that day actually were.

7         THE COURT:  I'm going to have to overrule the

8    objection.  I think this goes to -- he's described he

9    doesn't have any recollection of anything, Ms. Sison.  He

10   doesn't even recall the waiver of the rights, according to

11   Mr. Darcy's testimony.  And I think the details of the

12   interrogation and the setting of the interview that we have

13   heard about, that goes to the totality of the circumstances

14   so that I can determine whether or not the defendant's will

15   has been overborne by any type of -- actually by the

16   officers or even any type of critical impairment of the

17   defendant.

18        MS. SISON:  I understand that you're letting it

19   in, Your Honor, but I do want the Court to know that my

20   client's never seen this prior to us receiving it I think a

21   couple weeks ago, and that he did not adopt the statement

22   and he did not sign off on anything else.

23        THE COURT:  I'm not going there.  I want to see

24   what it says as it relates to the issue of his mental

25   capacity and also as it relates to whether or not his will

1  has been overborne by any type of overbearing or misconduct

2  or coercive conduct of the officers.  Call your witness.

3          MR. THORNELOE:  Your Honor, the government calls

4  Special Agent Newton.

5          THE COURT:  Agent Newton, come up please, sir.

6  Consider yourself still sworn, sir.

7                       **JAMES A. NEWTON**

8  having previously been duly sworn, resumed the stand on
   rebuttal and was examined and testified as follows:

9                     **DIRECT EXAMINATION**

10  **BY MR. THORNELOE:**

11  Q    Special Agent Newton, did you create a summary of the

12  interview that occurred with Mr. Darcy on February 24th?

13  A    Yes.

14          MR. THORNELOE:  Your Honor, I previously marked as

15  Government's Exhibit 2 for identification a document I'd

16  like to -- I've shown it to Ms. Sison, I'd like to show it

17  to the witness.

18          THE COURT:  All right.  Go ahead, sir.

19  Q    Special Agent Newton, do you recognize this document?

20  A    It is a FD-302, which is an FBI record of an interview.

21  Q    And is it standard practice to use this form to report

22  the -- to summarize interviews?

23  A    Yes.

24  Q    On what day did you do that summary?

25  A    February 26th is the date at the top of the form so ...

1    Q    And you believe that to be correct?

2    A    Yes.  The computer automatically fills that data in.

3    Q    Does it fairly and accurately represent a summary of

4    the interview that you held with Mr. Darcy on the 24th of

5    February?

6    A    Yes.

7    Q    And you wrote it yourself?

8    A    Yes.

9           MR. THORNELOE:  Your Honor, at this time I would

10   like to submit to the Court Government's Exhibit 2.

11          THE COURT:  Ms. Sison.

12          MS. SISON:  Your Honor, could I just voir dire him

13   on a couple of questions about that exhibit.

14                     **VOIR DIRE EXAMINATION**

15   **BY MS. SISON**

16   Q    Agent Newton, when you finished typing this out or

17   having somebody transcribe it, did you show it to my client

18   at all?

19   A    No.

20   Q    Did you ask him to sign off on it at any time?

21   A    No.

22   Q    And so this is your own recollection of what happened?

23   A    Mine and Agent Romagnuolo's, yes.

24   Q    And I take it you're the one that wrote it and he just

25   approved or looked it over?

1   A    I e-mailed it to him.  When I was done with it, he made

2   a couple corrections and then we both signed it, yeah, or

3   initialed it.

4   Q    Okay.

5           MS. SISON:  And, Your Honor, I would make the same

6   objection.

7           THE COURT:  It's overruled.  I'm going to allow

8   the document into evidence for the purpose of this

9   hearing -- for the purposes set forth in the proceeding.

10          Any further questions of the officer in regard to

11  rebuttal?

12          (Government's Exhibit No. 2 received.)

13          MR. THORNELOE:  Nothing further, Your Honor.

14          THE COURT:  Any cross-examination of the officer

15  in rebuttal?

16          MS. SISON:  No, Your Honor.  Thank you.

17          THE COURT:  All right.  Thank you very much

18  officer.

19          Any further evidence in rebuttal?

20          MR. THORNELOE:  Nothing further, Your Honor.

21          THE COURT:  All right.  The government would be

22  entitled to the opening and the closing arguments.

23          MR. THORNELOE:  No further rebuttal evidence, Your

24  Honor.

25          THE COURT:  No.  Have you got any --

1          MR. THORNELOE:  I'm sorry.

2          THE COURT:  You have the opening and the closing.

3          MR. THORNELOE:  Yes, Your Honor, I'm ready for

4    that.

5          THE COURT:  Do you want to open?

6          MR. THORNELOE:  Yes, sir.

7          THE COURT:  All right.  Fire away.

8          MR. THORNELOE:  Your Honor, first I'd like to --

9    I'd appreciate it if the Court, I offer *Colorado v.*

10   *Connelly*, and I think what that does is it sets up some

11   excellent context for how the Court should consider this

12   case and that is that burden here is on the government

13   indeed, but it is by a preponderance of the evidence, and I

14   think that's what that case largely stands for.

15         What we have seen today, initially we had two

16   agents come in here.  They gave very straightforward

17   testimony.  They had a clear recollection of the events that

18   occurred, and they told this Court about bringing Mr. Darcy

19   in for an interview in a very appropriate way.  They treated

20   him very professionally.  Very gently, in fact.

21         They brought him to a comfortable room that is

22   used as a conference room.  They gave the proper Miranda

23   warnings that they described were standard procedures.  The

24   Court sees the Miranda form and it sees that the rights that

25   he was advised of are the appropriate rights under Miranda,

and that the defendant did indeed initial each one and sign at the bottom with both the agents witnessing.

You heard today that the interview was of a reasonable length. It really lasted about 90 minutes, with 30 minutes of the defendant's own questions for the agents.

You heard that the defendant gave detailed statements in which he placed certain events in a proper time sequence; was able to recall events in detail, and that he really had a dialogue with the officers about what happened. And that he felt a sense of relief about getting this off his chest with the officers; that they were able perceive from him.

We heard that, from the officers, that he never made any mention of any pain medications. And that they -- even though they talked about medical conditions and talked about a relaxant that he was taking, and you heard that Special Agent Newton say that indeed he did give, talk about his stitches ripping out and needing this muscle relaxant. And he gave a detailed statement about that to Agent Newton.

And then you heard the defendant come in here and pretty much say the same thing. That he remembered giving that -- that that was indeed the reason that he took one of those medications.

So we see some confirmation of what he said at the time in truth from the defendant himself.

1        And then we also find that he was very comfortable

2    there.  He was given bathroom breaks.  He was offered

3    drinks, restroom breaks.  In no way was this a coercive

4    interview.  This wasn't an aggressive interview.  This was

5    not a hard sell.  This was listening to what the defendant

6    had to say and just reporting it that day in the form that

7    is now before the Court.

8        We heard from Special Agent Romagnuolo that he has

9    a lot of experience dealing with intoxicated individuals.

10   That he worked in a corrections facility and did bookings

11   for many, many years, and that he's witnessed people who are

12   drunk or under the influence of drugs.  And he had a good

13   opportunity to view the defendant.  And in his opinion, in

14   his many years of experience, almost two dozen, that the

15   defendant was not in any way spacey or out of his mind, or

16   unaware of his circumstances or what was going on, but, in

17   fact, that he was very much aware and engaging with those

18   agents.

19       And then we heard what was indeed a very different

20   story from the defendant.  We heard what I think is most

21   usually believe as a selective and convenient memory.

22       We heard that the defendant was -- recalls phone

23   calls he made to his brother.  He recalls dosages he took of

24   his medication.  He recalls where he was earlier in the day.

25   He recalls showing up at security.  And that he didn't go

1   through the gates, he was wanded through instead. And he

2   recalls that the agents were on the left and right side of

3   him, and he sat at the head of the table.

4         And then all he can really remember is probably

5   the most important thing: Is that he does remember this

6   paper in front of him and he does remember reading those

7   statements out loud.

8         And he's an individual who has a lot of experience

9   with Miranda rights. And there's case law out there that

10   says you can consider the characteristics of the defendant.

11         In this case the important characteristics to

12   consider I think would be his experience as a law

13   enforcement officer and his familiarity with Miranda. It

14   should really be second nature to him. And when it's

15   presented to him in that context, the assumption should be

16   that he understands what those rights mean.

17         And you heard that he confirmed that was his

18   signature and his initials. And there's every reason to

19   believe that the agents' version of events, which is that he

20   gave a detailed statement admitting to things that one would

21   not otherwise admit to unless they were true, that that is

22   the version of events that this Court should believe because

23   that is the version of events that is most critical.

24         I would ask that for those reasons, and

25   considering the standard, which is a preponderance of the

1    evidence, that the Court find, make a recommendation that

2    these statements not be suppressed.

3                 THE COURT:  Ms. Sison.

4                 MS. SISON:  Thank you, Your Honor.

5            What this court has to do today is actually

6    determine whether or not the tactics or the actions of the

7    FBI agents resulted in overbearing his will.

8            I understand that the Court is looking at the

9    coerciveness of that situation.  But I believe the Court has

10   to look for more.

11           If we were just making 18 U.S.C. 3501 inquiry into

12   the voluntariness of a confession, you're right; it would

13   just have to be whether it was voluntarily made.  However,

14   when we have a Miranda violations, the Court has to look

15   towards more.  And it's actually in the government's own

16   memoranda of law where they talk about the overbearing of

17   somebody's self-determination.  And essentially with that

18   said is can that person make a decision by himself without

19   being overborne by other people.  And there are three things

20   that that court -- that I believe it's the *Cristobal* court

21   said:  Did they intimidate?  Did they try to deceive?  Did

22   they try to coerce?

23           Now, I wish the FBI would tape these statements.

24   I know local law enforcement do it.  It would certainly make

25   my work easier.  It would make the government's work easier.

1  And certainly it would make the Court's work easier.

2  THE COURT:  I think there's a recent legislation

3  that was either passed or is going in effect in the state of

4  North Carolina that statements not only have to be recorded,

5  they have to be videotaped.

6  MS. SISON:  Yes, Your Honor.  And it's funny

7  because most states will do it.  And, in fact, everybody but

8  the federal government does it.  I mean, I shouldn't say

9  everybody, but people are considering it because they know

10  it's easier to get a determination of what happened in that

11  particular room that day.

12  So right now we're just relying on two agents

13  saying this is exactly what happened.  They did a report.

14  And I know what you're saying.  Well, you have another

15  person there, too, but he can't remember anything and that

16  really is the crux of the argument.

17  Mr. Thorneloe had said, look, how can he remember

18  everything that happened at the telephone conversation prior

19  to -- and he can't remember barley anything that happened

20  during the interrogation.

21  Well, there are a couple of things happening.

22  One, he's not in a conference room with two

23  agents.  He's in a car with his brother.  And as you heard

24  Mr. Darcy said, his brother is a helper to him and so his

25  brother can help him with the memory, because he's right

1  there saying, "Okay.  This is what we're going to do."  This

2  is what, in fact, they did.  And so when you look at what's

3  happening with the -- in the conference room, several things

4  happen.  First, let's look to see whether or not the agent

5  deceived Mr. Darcy.

6          They tell him they have an arrest warrant for him.

7  And so it's his understanding they want to take him to jail.

8  And they never said to him, "By the way, we want to

9  interview you first of all."  They never said that.  So I

10  don't understand why they can't say, "By the way, let's do

11  that."  Because it would certainly provide more information.

12          Secondly, they separated him from the person he

13  has been relying on since September, his brother, who has

14  been his caretaker, who takes him to all the doctor's

15  visits, and who happened -- who always goes to the doctor's

16  visits because he cannot remember what happens during that

17  time.  And so you've got that factor coming in.

18          Secondly, you've got two agents. Now, they say

19  it's for safety's sake.  Well, we have somebody who goes

20  through a metal detector so we know he doesn't have a gun.

21  He doesn't have any knives.  He doesn't have anything.

22          Secondly, he's disabled.  And so I don't

23  understand why you need two agents in that room, especially

24  when one of the agents isn't even familiar with the case.  I

25  mean, he said he hadn't been working on the case.  That he

1    got briefed.  But this is the way they do it.

2            And I suggest to the Court when you have two

3    people against one, certainly that should go to whether or

4    not that's a coercive tactic because certainly if there's

5    two people against one it's uneven.

6            Secondly, he indicated --

7            THE COURT:  I don't know of any rule that says --

8            MS. SISON:  That --

9            THE COURT:  -- during interrogation that there's

10   got to be an equal number of people --

11           MS. SISON:  I --

12           THE COURT:  -- defendants and --

13           MS. SISON:  I understand that, Your Honor.  But

14   still, when you have two people questioning somebody else,

15   it tends to make that person feel like they are all alone.

16   I mean I'm not saying that the FBI made up these rules in

17   order to do certain things, but certainly what is the effect

18   on that person being interviewed?

19           Secondly, they knew about the medication.

20           He said that the brother mentioned that he was on

21   meds.  But they don't go further, which is what is the

22   effect of this medication on you.  And I know the government

23   is suggesting, well, they really didn't have to do that.

24   Even the agent suggested that.

25           In this court every time you take a plea colloquy

1  you always ask the people, "What medications have you been

2  on, and are they interfering with what your understanding is

3  of what's going on today?"

4      Now, is a plea colloquy any less different, any

5  less important than somebody who is asked questions that are

6  going to incriminate himself?  I say not.

7      It was one simple question.  "How are these

8  medications affecting you?  Do you understand what's going

9  on?"  And they specifically said they didn't bother to tell

10 him.  They just relied on looking at him and saying, "Yeah,

11 he seems fine to me," even though they've never had

12 experience with this guy, and even though medications and

13 liquor or drugs have all sorts of different effects on

14 people.

15      THE COURT:  But then my notes showed they asked

16 him -- and I remember I underlined it -- said -- the agent

17 asked him if he could -- if he wished to go on with the --

18 as a result of any medication he had taken, if he wished to

19 go on and participate in the interview and he -- if he was

20 able to, and he said he absolutely was able to continue with

21 the interview.

22      MS. SISON:  But there's a --

23      THE COURT:  That's what they say Mr. Darcy said.

24      MS. SISON:  But there's a difference, Your Honor,

25 in knowing what the effects are and saying, "Can you

1   continue."  Because what's a person that is in a room with

2   these two agents going to say?  "Sure, yeah, let's go on."

3          He didn't have a full comprehension of what was

4   going on.  That was the effect of the drugs.  You heard him

5   say that he -- he felt -- and I'm using this word

6   "apprehensive" because I can't remember the exact word he

7   used, but that's my word -- that he didn't feel that he can

8   -- he can talk to anyone because he had asked to talk to

9   someone and they said no.  He didn't feel he could leave.

10   He was told he was under arrest; that there was an arrest

11   warrant.  So all of this --

12          THE COURT:  You'll admit that it was custodial.

13   He was under arrest.

14          MS. SISON:  Absolutely.  But I'm just saying that

15   these are all the things that are happening to him at this

16   time.  And I think just given all the circumstances you

17   can't just say, you know, this is a normal person that had

18   come in.

19          And granted, I'm not going to say he didn't have

20   police experience.  He was probably well aware of Miranda.

21   But we're talking about a police officer who was under the

22   influence of all this medication.  And for that reason -- an

23   in addition, the conduct of the agent, I think it all adds

24   up to his will being overborne.  And so that's why I would

25   ask this Court to suppress any statements that he made

1  during that time.  Thank you, sir.

2          THE COURT:  Thank you.  Rebuttal argument.

3          MR. THORNELOE:  Just a little bit, Your Honor.

4          I think one thing we must consider here is that

5  anything this Court can think about medications, it's all

6  from an layman's perspective.  Absolutely.

7          There's been no testimony here from the defense

8  side about what the effects of these medications are, and

9  it's reasonable that the Court should go with whatever

10  witness is most credible as to what the effects appear to be

11  on those things.

12          And second, I think if Your Honor will look at

13  *Cristobal*, which obviously you have given to us again, and I

14  mention in my brief, you can see the defendant there who is

15  laying in a hospital bed; he's chained to it.  He's been

16  shot I don't know how many times and he's on narcotics.  And

17  under those circumstances the Court found that the

18  statements he made were okay.  And we're not even close to

19  that.  At best we can say is it was two on one, and that

20  otherwise was a very comfortable interview.  And, you know,

21  I think the Court should just put into that context,

22  consider the preponderance of the evidence standard and make

23  its decision.

24          THE COURT:  All right.  Thank you very much.

25          David and I are going to talk about this, do some

1   research, and then we'll get out a Memorandum and

2   Recommendation as fast as we can.  I recognize that this

3   matter is coming up.

4           Let me give back to the government their exhibit.

5   I believe we've already scanned in the Advice of Rights.  I

6   need just a copy of this Government's Exhibit 2.  I don't

7   want this thing scanned in.

8           MR. THORNELOE:  I don't care.

9           THE COURT:  But I want to give you the original

10  back.

11          MR. THORNELOE:  Yes, sir.

12          THE COURT:  That you can give them to your

13  officers.  But I need you to just get me a copy of both.

14          MR. THORNELOE:  I'll leave that here.

15          THE COURT:  All right.  All right.

16          Anything further in regard to Mr. Darcy's matter

17  from the government or the defendant today?

18          MS. SISON:  No, Your Honor.  Thank you.

19          THE COURT:  That will complete the hearing in

20  regard to Mr. Darcy's case.

21          (Hearing concluded at 1:53:55 p.m.)

22                       - - - - - -

23

24

25

1    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF NORTH CAROLINA
2

3

4                     CERTIFICATE OF REPORTER

5            I, JOY KELLY, RPR, CRR, certify that the foregoing

6    is a true and correct transcription from the digital

7    recorded proceedings transcribed by me to the best of my

8    ability in the above-entitled matter.

9

10

11

12   S/  JOY KELLY                        _____

13   **JOY KELLY, RPR, CRR**                    Date
     **U.S. Official Court Reporter**
14   Charlotte, NC

15

16

17

18

19

20

21

22

23

24

25